UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

3D GLOBAL SOLUTIONS, INC. )
) Civil Action No. 1:06-cv-722(GK)
)
     Plaintiff )
v. )
)
MVM, INC. )
)
     Defendant )
_____)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

Plaintiff 3D Global Solutions, Inc. (hereinafter "3D") executed an agreement with MVM, Inc, (hereinafter "MVM") whereby 3D would supply third country nationals (hereinafter "TCN's") to MVM for deployment to Kabul Afghanistan and the parties executed an agreement on September 26, 2005[1]. The agreement specified that Plaintiff shall provide an administrative package for each TCN that included various qualifications, tests, and background checks and that MVM shall review and determine that each TCN provided by Plaintiff met all the requirement of the contract. (See Exhibit 1-MVM contract with 3D, Par. C). After determining each TCN provided by Plaintiff met the conditions and requirement of the contract, Defendant submitted the TCN's administrative package to the US Department of State for approval for deployment to

---

[1] The agreement between MVM and 3D was a subcontract to the prime contract between MVM and the U.S. Government (See Counterclaim).

1

Kabul, Afghanistan. As a result, 230 TCN's were deployed by MVM to Kabul Afghanistan pursuant to the agreement. The 230 TCN's were employed by MVM and executed employment agreements with MVM, which satisfies the conditions for payment under the contract between MVM and 3D. (see Exhibit 6- Turner Affidavit). 3D invoiced MVM for the services provided consisting of the 230 TCN's at a rate of $700 per TCN. (see Exhibit 4). MVM has failed to pay 3D despite receiving a 3.5 million dollar payment from the US government to settle claims including that of the subcontractors who provided services and which MVM stated it would. (See Exhibits 2, 5 and 6). Despite the representations and requirements of the settlement agreement with the US government, that require MVM settle claims with its subcontractors like 3D, Defendant has failed to make payment to 3D for the 230 TCN it requested from 3D and then employed. (See Exhibits 2,4,5 and 6).

## II. STANDARD OF REVIEW

Summary judgment will be granted when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits or declarations, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). A fact is "material" if it might affect the outcome of the action under the governing law. See _Anderson v. Liberty Lobby, Inc_. 477 U.S. 242 (1986). The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact. See _Celotex Corp. v. Catrett_, 477 U.S. 317, 322 (1986)

In determining whether the movant has met this burden, a court must consider all factual inferences in the light most favorable to the non—moving party. _McKinney v._

2

*Dole*, 765 F.2d 1129, 1135 (D.C. Cir. 1985); see also *Anderson*, 477 U.S. at 255. Once the moving party makes its initial showing, however, the nonmoving party must demonstrate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *McKinney*, 765 F.2d at 1135. Accordingly, the nonmoving party must provide evidence that would permit a reasonable jury to find in his or her favor. *Liberty Lobby*, 477 U.S. at 255—56. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249—50 (citations omitted)

### III.   STATEMENT OF FACTS.

In July 2005, the United States Government awarded Defendant MVM, Inc., a contract (hereinafter, the "prime contract") to provide security guards for the United States Embassy in Kabul Afghanistan. (Counterclaim, ¶ 1).  Subsequently, Defendant entered into a contract (hereinafter the "subcontract") with Plaintiff 3D Global Solutions, Inc. whereby Plaintiff agreed to recruit third-party national security personnel ("TCNs") for the prime contract. See Counterclaim, ¶ 2 and Counterclaim, Exhibit 1 (copy of the subcontract).

Under the subcontract, Defendant issued two task orders to Plaintiff: the first (effective September 29, 2005) sought 65 TCN guards, and the second (effective October 4, 2005) requested 145 TCN guards and 20 TCN Senior Guards. See Counterclaim 5.  Thus, a total of 230 TCNs were requested by Defendant for deployment to Kabul, Afghanistan under the subcontract. See Counterclaim, ¶ 5;

Exhibit1 and 6. No further task orders were sent to Plaintiff from Defendant under the subcontract. See Exhibit 5- Affidavit of Michael Dodd.

Under the subcontract, Plaintiff agreed to recruit qualified TCNs, Exhibit 1, §§ A-B, and complete an "Employment Package" containing documentation establishing the qualifications of the candidate TCNs. Exhibit 1, § C (1). Defendant was to review the Employment Package of each candidate TCN to determine if the candidate was fully qualified under the subcontract, and if Defendant determined that the requirements were met, Defendant was to forward the Employment Package to the Department of State for approval.[2] Exhibit 1, § C (1). If the DOS approved the candidate, Defendant was to employ the candidate TCNs if they completed additional forms and upon "final approval by the DOS". Exhibit 1, § C (1).

As compensation for recruitment, Defendant was to pay "the specified per person fee for each fully qualified TCN who receives a final employment offer from [Defendant] and deploys to Kabul, Afghanistan. Exhibit 1, § D (1). Plaintiff was to invoice once deployment occurred, and Defendant was to pay the invoices within thirty days of receipt. See Exhibit 1, § D (1 and 2). The recruiting fee for each TCN was $700.00: $300.00 for recruitment, $70.00 to determine the candidate met contractual requirements, and $330.00 to ensure deployment readiness. See Exhibit 1 (Exhibits D and E). The $700.00 fee was due for each of the 230 deployed TCN's for which MVM has failed to compensate 3D. See Id.; Exhibit 5-6.

---

[2] The Employment Package consists of the paperwork listed in Exhibit C to the subcontract referenced herein as Exhibit 1 (Exhibit C).

4

In addition, Defendant was obligated to reimburse Plaintiff for costs incurred with obtaining passports those TCNs. After deployment, Plaintiff was required to provide post-deployment services. (*Id.*)

In fact, Plaintiff recruited 230 TCNs and submitted Employment Packages for each. Defendant reviewed and determined that each administrative package met the contractual conditions and submitted the administrative packages to the US Department of State. (See Exhibits 1, 5-6: Subcontract; Jaysen Turner Affidavit; Michael Dodd Affidavit). Defendant then employed the 230 TCNs and deployed them to Kabul, Afghanistan. See Exhibit6- Turner Affidavit; Counterclaim, ¶ 6; Letter MVM (seeking damages for deploying TCNs by air). At no time did Defendant provide any notice to Plaintiff that the TCNs lacked sufficient qualifications or that approval of the Department of State had not been received for deployment. See Exhibit 3 (Defendant's Admissions of Fact ##18 and 27). In fact, Defendant interviewed, qualified, and hired all 230 TCNs requested by the task orders. See Exhibits1, 6- Turner Affidavit. Defendant attended the orientation meetings of the TCNs prior to deployment. Exhibit 1 (Exhibit D); Exhibits 5,6- Turner Affidavit. Plaintiff sent invoices to Defendant for the deployment of the TCNs, and for costs incurred with obtaining passports for the TCNs. Thereafter, Plaintiff performed post-deployment services in November and December of 2005, and sent invoices to Defendant for performing those services. (*Id.*)

Defendant refused to pay any of the invoices claiming a material breach of the subcontract. Defendant alleged that the "majority" of TCNs whose credentials it was required to review and submit for approval to the U.S. Government under the subcontract prior to employing and deploying them, were later determined by the U.S.

5

Government not to meet required English speaking qualifications. Defendant refused to provide exact details and documentation to Plaintiff, and refused to permit Plaintiff an opportunity to remedy any deficiencies. Defendant terminated the subcontract on or about December 23, 2005. Counterclaim, ¶ 10.

Thereafter, on or about March 23, 2006, Defendant and the United States government modified the prime contract to be terminated nunc pro tunc effective December 22, 2005. See Exhibit 2 -Modification of Prime Contract. The contract was terminated for convenience of the government and not based upon a default of Defendant. See Exhibit 2; Exhibit 3 - Defendant's Admission of Fact #1. Defendant released any claims that Plaintiff may have had against the United States Government, and received at least $3,500,000.00. See Exhibit 2.

Plaintiff filed suit seeking monies dues under the subcontract on April 21, 2006. See Docket Entry #1 (Complaint). On August 10, 2006, Defendant filed an answer denying all liability and a counterclaim alleging that Plaintiff had caused the termination of the Prime Contract and seeking unspecified damages of $2,000,000.00. Docket Entry # 18 (Counterclaim). On the same day, an Amended Complaint was filed. Docket Entry #19.

**IV.    LEGAL ARGUMENT.**

   A. Plaintiff has Met its Obligations under the Subcontract for Payment.

Plaintiff fully performed the requirements of the subcontract in this case as to the pre-deployment requirements of the contract for payment. Defendant reviewed the candidates recruited by Plaintiff and bore responsibility under the subcontract to obtain approval from the U.S. Government prior to hiring and deploying the TCNs. The TCNs

6

were: (1) deemed acceptable by Defendant, after presumably being approved by the U.S. Government[3]; (2) hired by Defendant; and (3) deployed to Afghanistan.

Having satisfied the conditions for payment according to the parties contract, Plaintiff is due fees as stated therein for 230 TCN's. When viewing these facts in the light most favorable to Defendant, a reasonable juror could not find in favor of the Defendant on this issue.

B. <u>The U.S. Government's Termination of its Contract with MVM for Its "Convenience" Foreclosed MVM'S Defense that Plaintiff was in Breach of the Sub-Contract.</u>

The Government has the unique right to terminate a contract for convenience: The Government may terminate performance of work under its contract with MVM in whole or, from time to time, in part, if it determines that a "termination is in the Government's interest " 48 C.F.R. § 52.249-6(a). Under a termination for convenience, the contractor, MVM, instead of receiving compensation for governmental breach of contract based on classical measures of damages, is limited to recovery of 'costs incurred, profit on work done and the costs of preparing the termination settlement proposal.'" *Maxima Corp. v. United States*, 8478 F.2d 1549, 1552 (Fed. Cir. 1988) (citing R. NASH & J. CIBINIC, FEDERAL PROCUREMENT LAW 1104 (3d ed. 1980)).

In return for the Government's right to unilaterally terminate the prime contract, the contractor, MVM, is entitled to recover certain costs. Those costs of the prime contractor are (a) its performance costs (includes subcontractors claims) incurred up to the date of termination; (b) certain costs that continue after the date of termination; (c)

---

[3] Defendant was required under the subcontract to ensure that the TCN candidates were fully qualified and approved by the United States Government prior to employing and deploying the TCNs.

termination settlement expenses, i.e., costs incurred to terminate the contract and submit a termination claim to the government; and (d) profit or fee for work performed. *Id.*; *See also Torncello v. U.S. 681 F2d. 756 (1982).* As a result, Defendant is foreclosed by the termination of the prime contract for convenience of the Government to argue that Plaintiff breached the subcontract.

      In this case, the prime contract was terminated for convenience of the government. Thus, both Defendant and the United States Government have agreed that no default occurred on part of the Defendant, i.e., any security detail provided met the requirements. Defendant has also by accepting the termination for convenience of the government agreed that the United States has not breached the contract in bad faith, and accepted that 3.5 million dollars represents its total costs and profits for work performed up to December 22, 2005. Because 3D Global Solutions, Inc. had fully performed the requirement under the contract by supplying all TCNs before December 22, 2005, Defendant should not be permitted, i.e., should be estopped from arguing inconsistently that Plaintiff caused a default under the prime contract whereby Defendant lost the value of that contract when in fact it has recognized that it has been fully paid for all costs and received all profits for that work.

    C. <u>Defendant's Counterclaim should be Dismissed because Defendant had received payment from the US. Government in settlement of claims an for "Convenience of the Government".</u>

  Plaintiff adopts the arguments in Paragraph B as set forth herein. Further, Defendant is not entitled to lost profits sought in its counterclaim. When the federal government modifies a contract pursuant to a termination for convenience clause,  a private

8

contractor is limited to recovery of costs incurred, profit on work done and the costs of preparing the termination of settlement proposal. Recovery of anticipated profit is precluded. *See Maxima, 847 F.2d at 1552 (quoting R. Nash & J. Cibinic, Federal Procurement Law 1104 (3d ed. 1980.)*. Therefore, lost profits under the prime contract as alleged in Defendant's counterclaim cannot have been caused, legally or factually, by the Plaintiff. Under these facts, no reasonable juror, in viewing the facts most favorable to Defendant, can find in MVM's favor on its claim for lost profits. Therefore, Plaintiff's request for Summary adjudication on this issue is appropriate and requiring the dismissal of Defendant's counterclaim.

## CONCLUSION

A reasonable juror, when viewing the facts most favorable to the Defendant, can not find in its favor on any of the issues herein. For the foregoing reasons, this court should grant Plaintiff's Motion for Summary Judgment in its favor on the issue the Plaintiff is entitled to compensation for the 230 TCN's it provided MVM pursuant to the subcontract and to dismiss Defendant's counterclaim for lost profits.

Dated:  March 5, 2008                             Respectfully submitted,

_____/s/_____
Athan T. Tsimpedes
DC Bar no. 452341
1420 New York Avenue, NW
7th Floor
Washington, DC 20005
202-638-2100
202-449-3499 (fax)

CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that on March 5, 2008 a copy of the foregoing Plaintiff's Motion for Summary Judgment, was served electronically and by first class mail, postage prepaid upon:

Herbert S. Rosenblum
Law Offices of Herbert S. Rosenblum
526 King St # 211
Alexandria, VA 22314
Attorney for Defendant


                              _____/s/_____
                              Athan T. Tsimpedes