## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| 3D GLOBAL SOLUTIONS, INC., | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) Case No. 1:06cv00722 (GK) |
| | ) |
| MVM, INC., | ) |
| | ) |
| *Defendant.* | ) |

## DEFENDANT MVM INC.'S ANSWER AND COUNTERCLAIM

Defendant MVM, Inc. ("MVM"), by counsel and pursuant to this Court's July 19, 2006

Order, files this Answer and Counterclaim ("Answer") to the Complaint ("Complaint") filed by

Plaintiff 3D Global Solutions, Inc. ("3D") in this lawsuit.

### ANSWER

For its Answer, MVM states as follows:

### Parties

1.     MVM admits that 3D is incorporated in Indiana, and has its principal offices at

12898 Pontell Place, Westfield, Indiana 46074.  MVM does not have sufficient information to

form a belief as to the truth of the remaining allegations in Paragraph 1 of the Complaint, and

therefore it denies such allegations.

2.     MVM admits that it is incorporated under the laws of California.  MVM admits

that it maintains offices located at 1593 Spring Hill Road, Vienna, Virginia 22182.  MVM admits

that it holds contracts with the United States Government ("United States"), and that some of

those contracts are for the provision of security guards to locations around the world. MVM denies the remaining allegations of Paragraph 2 of the Complaint.

## Jurisdiction and Venue

3.      The allegation in Paragraph 3 of the Complaint is a legal conclusion to which no response is warranted.

4.      The allegation in Paragraph 4 of the Complaint is a legal conclusion to which no response is warranted.

5.      The allegation in Paragraph 5 of the Complaint is a legal conclusion to which no response is warranted.

## Background Facts

6.      MVM admits that it entered into a contract with the United States to provide security guards for the U.S. Embassy in Kabul, Afghanistan. MVM admits that it entered into a contract with 3D dated September 26, 2005 ("Contract") to assist in performing MVM's contract with the United States for security guards to Kabul, Afghanistan. MVM denies that the contract attached to the Complaint as Exhibit 1 is the contract that governs the agreement between MVM and 3D for the security guards for Kabul, Afghanistan. MVM is without sufficient information to form a belief of the remaining allegations in Paragraph 6 of the Complaint, except to admit that 3D did recruit third county nationals ("TCNs") from Peru as security guards for the Kabul embassy, otherwise the remaining allegations of Paragraph 6 are denied.

7.      MVM admits that it placed two task orders, effective September 29 and October 4, 2005, against the Contract. MVM denies that the task order dated October 12, 2005 and attached to the Complaint in Exhibit 2 is for the provision of security guards to Kabul,

2

Afghanistan. MVM states that the documents attached to the Complaint as Exhibit 2 speak for themselves. MVM denies the remaining allegations in Paragraph 7 of the Complaint.

8.    MVM denies that the fee schedule attached in Exhibit 3 applies to the TCNs sent to Kabul, Afghanistan because the fee schedule is applicable only to the TCNs sent to Iraq under the October 12, 2005 contract. MVM states that the documents referred to in Paragraph 8 speak for themselves, and denies any remaining allegations in Paragraph 8 of the Complaint.

9.    MVM denies that the documents referred to in Paragraph 9 govern the provision of TCNs sent to Kabul, Afghanistan. MVM states that the documents referred to in Paragraph 9 speak for themselves, and denies any remaining allegations in Paragraph 9 of the Complaint.

10.    MVM denies that the October 12, 2005 agreement or the October 12, 2005 task order governs the provision of guards to Kabul, Afghanistan. MVM does not have sufficient information to form a belief as to the remaining allegations in Paragraph 10 of the Complaint, and therefore it denies such allegations.

11.    MVM states that the document referred to in Paragraph 11 speaks for itself. MVM denies that the data 3D allegedly collected on each TCN was confidential and proprietary in nature. MVM admits that 3D provided MVM with certain basic types of information on each TCN but denies the remaining allegations in Paragraph 11 of the Complaint.

12.    MVM denies that the October 12, 2005 contract governs the provision of TCNs to Kabul, Afghanistan. MVM states that the document referred to in Paragraph 12 speaks for itself. MVM does admit that 3D deployed 230 TCNs to Kabul, Afghanistan, but denies the remaining allegations in Paragraph 12 of the Complaint.

13.    MVM denies the allegations of Paragraph 13 of the Complaint.

14.    There is no Paragraph 14 in the Complaint, and therefore no response is required.

3

15. MVM denies the allegations in Paragraph 15 of the Complaint.

16. MVM admits that 3D defaulted under the Contract because 3D did not provide TCNs that had the contractually-required level of English proficiency to serve as security guards at the Kabul embassy. MVM denies the remaining allegations of Paragraph 16 of the Complaint.

17. MVM denies the allegations in Paragraph 17 of the Complaint.

18. MVM denies the allegations in Paragraph 18 of the Complaint.

19. MVM denies the allegations in Paragraph 19 of the Complaint.

## COUNT ONE
### (Breach of Contract)

20. MVM restates its responses in Paragraphs 1 through 19 of this Answer as set forth in full.

21. MVM denies the allegations in Paragraph 21 of the Complaint.

22. MVM denies the allegations in Paragraph 22 of the Complaint.

23. MVM denies the allegations in Paragraph 23 of the Complaint.

## COUNT TWO
### (Detrimental Reliance)

24. MVM restates its responses in Paragraphs 1 through 23 of this Answer as set forth in full.

25. MVM denies the allegations in Paragraph 25 of the Complaint.

26. MVM denies the allegations in Paragraph 26 of the Complaint.

27. MVM denies the allegations in Paragraph 27 of the Complaint.

28. MVM denies the allegations in Paragraph 28 of the Complaint.

4

## COUNT THREE
### (Intentional/Negligent Misrepresentation)

29.    MVM restates its responses in Paragraphs 1 through 28 of this Answer as set forth

in full.

30.    MVM denies the allegations in Paragraph 30 of the Complaint.

31.    MVM denies the allegations in Paragraph 31 of the Complaint.

32.    MVM denies the allegations in Paragraph 32 of the Complaint.

33.    MVM denies the allegations in Paragraph 33 of the Complaint.

34.    MVM denies the allegations in Paragraph 34 of the Complaint.

## COUNT FOUR
### (Constructive Fraud)

35.    MVM restates its responses in Paragraphs 1 through 34 of this Answer as set forth

in full.

36.    MVM denies the allegations in Paragraph 36 of the Complaint.

37.    MVM denies the allegations in Paragraph 37 of the Complaint.

38.    MVM denies the allegations in Paragraph 38 of the Complaint.

39.    MVM denies the allegations in Paragraph 39 of the Complaint.

## COUNT FIVE
### (Concealment or Non-Disclosure)

40.    MVM restates its responses in Paragraphs 1 through 39 of this Answer as set forth

in full.

41.    MVM denies the allegations in Paragraph 41 of the Complaint.

42.    MVM denies the allegations in Paragraph 42 of the Complaint.

43.    MVM denies the allegations in Paragraph 43 of the Complaint.

44.    MVM denies the allegations in Paragraph 44 of the Complaint.

5

45.    MVM denies the allegations in Paragraph 45 of the Complaint.

## COUNT SIX
## (Negligent or Intentional Interference with Business Advantage)

46.    MVM restates its responses in Paragraphs 1 through 45 of this Answer as set forth

in full.

47.    MVM denies the allegations in Paragraph 47 of the Complaint.

48.    MVM denies the allegations in Paragraph 48 of the Complaint.

49.    MVM denies the allegations in Paragraph 49 of the Complaint.

## COUNT SEVEN
## (Unjust Enrichment)

50.    MVM restates its responses in Paragraphs 1 through 49 of this Answer as set forth

in full.

51.    MVM denies the allegations in Paragraph 51 of the Complaint.

52.    MVM denies the allegations in Paragraph 52 of the Complaint.

53.    MVM denies the allegations in Paragraph 53 of the Complaint.

## COUNT EIGHT
## (Constructive Conversion)

54.    MVM restates its responses in Paragraphs 1 through 53 of this Answer as set forth

in full.

55.    MVM admits that MVM properly obtained possession of the packages containing

the TCNs' information and data. MVM denies the remaining allegations in Paragraph 55 of the

Complaint.

56.    MVM denies the allegations in Paragraph 56 of the Complaint.

57.    MVM denies the allegations in Paragraph 57 of the Complaint.

58.    MVM denies the allegations in Paragraph 58 of the Complaint.

6

59.    MVM denies all remaining allegations not expressly admitted in this Answer.

## COUNTERCLAIM

For its Counterclaim, MVM states as follows:

### The Afghanistan Contract

1.    In July 2005, the U.S. Department of State awarded MVM a contract for the provision of security guards to the U.S. Embassy in Kabul, Afghanistan for $23.7 million.

2.    MVM and 3D entered into a contract dated September 26, 2005 ("Afghanistan Contract," attached as **Exhibit 1.**). Under the Afghanistan Contract, 3D agreed to supply MVM with third-party national security personnel ("TCNs") in support of MVM's contract with the U.S. Department of State.

3.    The Afghanistan Contract required 3D to provide TCNs and to certify that the TCNs spoke English at a specified proficiency level. MVM explained the English-speaking requirements in detail to 3D before 3D executed the Afghanistan Contract. The English-speaking requirements are clearly stated in detail in the Afghanistan Contract.

4.    The Afghanistan Contract permitted MVM to immediately terminate the Afghanistan Contract by written notice to 3D in the event that the U.S. Department of State terminated its contract with MVM for the provision of security guards to the U.S. Embassy in Kabul, Afghanistan.

5.    MVM issued two task orders to 3D under the Afghanistan Contract. The first task order (effective September 29, 2005) requested 65 TCN Guards for deployment to Kabul, Afghanistan, and the second task order (effective October 4, 2005) requested a total of 165 TCNs (comprised of 145 TCN Guards and 20 TCN Senior Guards) for deployment to Kabul,

7

Afghanistan. Thus, MVM requested a total of 230 TCNs for deployment to Kabul, Afghanistan under the Afghanistan Contract.

## 3D's Failure to Provide English-Speaking Guards to Kabul, Afghanistan

6.     Pursuant to the Afghanistan Contract and the two task orders placed against the Afghanistan Contract, 3D recruited from Peru and deployed 230 TCNs to Kabul, Afghanistan.

7.     On December 2, 2005, the U.S. Department of State informed MVM that the guards sent by 3D to Kabul did not meet the minimum language level requirements, despite the fact that 3D certified language proficiency for each TCN. An independent language-testing company determined that the TCNs failed to speak English at the proficiency levels required by the Afghanistan Contract.

## The Termination of the Afghanistan Contract

8.     On December 21, 2005, the State Department terminated for default its contract with MVM because the TCNs could not speak English at the proficiency level required by the State Department, which was the same proficiency level required by MVM in the Afghanistan Contract.

9.     On December 22, 2005, MVM ordered 3D to suspend its recruiting and pre-deployment efforts under the Afghanistan Contract.

10.    On December 23, 2005, MVM terminated the Afghanistan Contract because 3D defaulted in its obligation to provide TCNs who were able to speak English at the level required by the Afghanistan Contract.

11.    3D's failure to provide TCNs who were able to speak English at the level required by the Afghanistan Contract directly caused the State Department to terminate MVM's contract for the provision of security personnel to the U.S. Embassy in Kabul, Afghanistan.

8

12. The State Department's termination of MVM's contract caused at least $2,000,000 in damages to MVM.

## COUNT ONE
### (Breach of September 26, 2005 Contract)

13. MVM restates its allegations in Paragraphs 1 through 12 of this Counterclaim as set forth in full.

14. MVM and 3D entered into a valid, enforceable contract dated September 26, 2005 (referred to in this Counterclaim as the "Afghanistan Contract")

15. The Afghanistan Contract covered 3D's deployment of TCNs to the U.S. Embassy in Kabul, Afghanistan.

16. The Afghanistan Contract required 3D to recruit and deploy TCNs with specific English proficiency levels. This requirement was a material term of the Afghanistan Contract.

17. 3D breached the Afghanistan Contract by failing to provide TCNs with the required English proficiency levels.

18. As a result of 3D's breach of the Afghanistan Contract, the State Department terminated its contract with MVM for the provision of security personnel to the U.S. Embassy in Kabul, Afghanistan.

19. MVM sustained at least $2,000,000 in damages as a result of the State Department's termination which was proximately and actually caused by 3D's breach of the Afghanistan Contract.

9

WHEREFORE, Defendant and Counterclaim Plaintiff MVM, Inc. demands judgment against Plaintiff and Counterclaim Defendant 3D Global Solutions, Inc. for damages in the amount of $2,000,000.00, plus interest and costs, and plus any other relief as justice so requires.

Respectfully Submitted,

MVM, INC.

*By Counsel*

**MCGUIREWOODS LLP**
1750 Tysons Boulevard, Suite 1800
McLean, VA 22101-3892
Tel: (703) 712-5000
Fax: (703) 712-5050

Sean F. Murphy (D.C. Bar No. 457599)
Anand V. Ramana (D.C. Bar No. 489478)

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of August, 2006, I served a true and correct copy of the foregoing pleading via first-class U.S. mail and electronic mail on:

Athan T. Tsimpedes, Esq.
Law Offices of Athan T. Tsimpedes
7th Floor
1420 New York Avenue, N.W.
Washington, D.C. 20005
atsimpedes@comcast.net
*Counsel for 3D Global Solutions, Inc.*

Anand V. Ramana

\4095934.2

11

Sep 26 05 11:37a      3D Global Solutions Inc        866-238-6761          p.1

## AGREEMENT FOR RECRUITING SERVICES

THIS AGREEMENT FOR SERVICES ("Agreement") by and between MVM, Inc., a California corporation with offices at 1593 Spring Hill Road, Vienna, Virginia 22182 ("MVM") and 3D Global Solutions Inc. a Indiana corporation with offices at 12898 Pontell Place, Westfield, Indiana 46074 ("3D") is dated as of September 26, 2005.

WHEREAS, 3D has competence, capability and experience relating to recruiting of security personnel; and

WHEREAS, 3D is prepared to make such competence, capability and experience available to MVM by recruiting third party nationals ("TCNs") as security personnel in support of an MVM contract with the US Department of State (the "DOS"); and

WHEREAS, MVM desires to use 3D to provide such recruiting services;

THEREFORE, the parties agree to the following the terms and conditions in connection with the provision of such recruiting services by 3D:

### A.   SCOPE OF SERVICES.

3D shall recruit, provide specified pre-deployment services and provide specified post-deployment support services to MVM. The personnel supplied by 3D will become employees of MVM and will perform as security personnel in support of MVM's contract with the DOS Embassy Security Force, Kabul, Afghanistan (the "Services").

The services to be provided by 3D are described in Exhibit D.

MVM shall request 3D to recruit such TCNs, on an ongoing basis, in the number and for the duration specified by MVM in Task Orders issued to 3D from time to time. The form of such Task Order is set forth in Exhibit A hereto. The terms and conditions of employment 3D shall offer such TCNs will be provided to 3D with each Task Order.

### B.   QUALIFICATIONS OF TCNs.

1.     Each TCN (i) shall be in good general health without physical or mental disabilities, either temporary or long lasting, that would interfere with the performance of his assigned duties including standing for prolonged periods of time in performance of guard duty, (ii) shall be free from communicable disease, (iii) shall have binocular vision correctable to 20/30 Snellen and shall not be colorblind (iv) shall be capable of hearing ordinary conversation. 3D shall provide evidence of physical fitness of each TCN by a certification from a licensed physician within such TCN's country of origin, based on a physical examination conducted prior to the TCN's assignment.

2. Each TCN shall be free of all Schedule I-V drugs which are covered in the Federal Drug Testing Program, as detected in such TCNs urine or saliva sample, unless such drug is validly prescribed for such TCN by a licensed physician. 3D shall provide evidence of testing for such drugs, which testing shall be conducted in such TCNs country of origin and in accordance with the US Department of Health and Human Services Mandatory Guidelines for Federal Workplace Drug Testing Programs. These Guidelines can be





EXHIBIT

1

Sep 26 05 11:37a      3D Global Solutions Inc      866-238-6761                          P.2

reviewed at www.health.org/workplace. MVM will supply a list of drugs for which tests
will be conducted.

3. Each TCN shall receive all DOS recommended inoculations for Afghanistan. 3D shall
provide evidence that each TCN has received all recommended inoculations for
Afghanistan. MVM will supply a list of required inoculations to 3D.

4. 3D shall provide evidence of criminal and pre-employment background checks for each
TCN conducted in the TCN's country of origin, in form and substance satisfactory to
MVM.

5. In addition to the qualifications set forth in this Paragraph B, each TCN shall
meet the qualifications of the position for which he is applying, which qualifications and
positions are set forth in Exhibit B hereto.

6. In addition to the qualifications set forth in this Paragraph B, no TCN (i) shall have
been convicted of any felony or any misdemeanor involving moral turpitude during the
five year period prior to the date of employment application, (ii) shall have been declared
by any court of competent jurisdiction incompetent by reason of a mental condition or
defect or (iii) shall suffer from habitual drunkenness or narcotics addiction or dependence
as evidenced by the drug testing procedure in Paragraph B2, above, or information
developed in the vetting process.

7. 3D shall certify to MVM that each TCN meets each of the qualifications set
forth in this Paragraph B.

## C.  PROCEDURE.

1. 3D shall provide to MVM an application package for employment, and an application
package for Medium Risk Public Trust Certification, completed by each TCN as well as
the certifications and evidence of various tests and background checks required by
Paragraph B of this Agreement, in English and in the format required by MVM (the
"Employment Package").

MVM shall review each Employment Package and shall submit to the DOS Employment
Packages for TCNs that MVM determines meet the requirements contained in this
Agreement. Upon approval by the DOS of an Employment Package, MVM will offer
employment to such TCN conditioned on the satisfactory completion in English of the
forms listed in Exhibit C hereto and the final approval by the DOS. The decision to hire a
TCN recruited by 3D shall be made solely by MVM following the approval of such TCN
by the DOS.

2. MVM agrees to reimburse 3D for the cost of obtaining a passport for any qualified TCN
candidate who does not have a passport and is unable to pay for one in advance of
employment. The Employee Agreement that MVM will sign with each employee will state
that MVM will recover this cost from the employee's initial pay check.

## D.  FEE FOR SERVICES.

1. On the condition that 3D fully and faithfully performs the Services, MVM shall pay
3D fees in the amounts and types shown in Exhibit E.

For pre-deployment services:

2



- • MVM will pay the specified per person fee for each fully qualified TCN who receives a final employment offer from MVM and deploys to Kabul, Afghanistan.
- • 3D will invoice once deployment has occurred

For post-deployment services:

- • MVM will pay the specified monthly fee for each TCN supplied by 3D who is deployed to Kabul in a given calendar month. For administrative convenience, if a TCN is on duty in Kabul for 15 days or less in a given calendar month, this will not count toward the fee calculation. If a TCN is on duty in Kabul for 16 days or more in a given calendar month, this will count toward the fee calculation.
- • 3D will invoice monthly.

2. MVM shall pay all approved invoices within thirty days of receipt.

## E.   INDEPENDENT CONTRACTOR.

3D is retained as an independent contractor solely to provide the Services and the Recruitment Consultant. No agency is created by the terms of this Agreement and 3D shall not hold itself out to others to be an agent of MVM. 3D shall not have the power to execute any document or agreement on behalf of MVM or to otherwise bind MVM in any respect.

## F.   TERM OF AGREEMENT.

The term of this Agreement shall commence on the date hereof and shall continue until terminated. Either party may terminate this Agreement immediately by written notice to the other party in the event of a material breach of this Agreement by such other party. MVM may terminate this Agreement immediately by written notice to 3D in the event MVM's contract with the DOS is terminated. Either party may terminate this Agreement by providing thirty days written notice to the other party.

## G.   NON-EXCLUSIVE ARRANGEMENT.

During the term of this Agreement, 3D shall not accept assignments from other clients if such assignments would interfere with the performance by 3D of the Services required hereby.

## H.   CONFIDENTIAL BUSINESS INFORMATION.

3D agrees that it will hold in confidence all information provided to 3D by MVM (including the terms of this Agreement) concerning MVM's business including, but not limited to, MVM's contracts, personnel and operations (the "Confidential Business Information"). 3D agrees not to disclose such Confidential Business Information to any person without MVM's consent. 3D agrees that it will not use any Confidential Business Information for any reason other than for the performance of the Services. 3D's obligation under this Paragraph H shall survive for three years after the termination of this Agreement.

## I.   NOTICES.

Any notices required or permitted to be given hereunder shall be given in writing and delivered to a party in person or at such party's address (or facsimile number) stated below

3



or to such other address (or facsimile number) as such party shall advise the other party in writing, and will be deemed received when tendered in person or when sent by facsimile or by certified mail:

MVM, Inc.
1593 Spring Hill Road
Vienna, Virginia 22182
Attention: Clyde Slick
Facsimile: (703) 827-0780

3D Global Solutions, Inc.
12898 Pontell Place
Westfield, Indiana 46074
Attn: Mike Dodd

J. MISCELLANEOUS.

This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia without regard to its conflicts laws.

The exhibits to this Agreement are incorporated herein by this reference.

This Agreement supersedes all prior arrangements and understandings between the parties in respect of the subject matter hereof and constitutes the entire agreement between the parties in respect of such subject matter.

This Agreement may be executed in counterparts, each executed counterpart constituting an original but all together constituting only one Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

MVM, INC.

Signed:

Name: ROBERT L. RUBIN

Title: Senior Vice President

3D GLOBAL SOLUTIONS INC.

Signed:

Name: Michael F. Dodd

Title: President

4

## EXHIBIT A

## SAMPLE TASK ORDER

In accordance with the Agreement for Recruiting Services dated September _____, 2005 by and between MVM and 3D, MVM hereby instructs 3D to recruit TCNs to fill the security personnel positions listed below:

Number of TCNs                          Type of Position to be Filled

TCNs covered by this Task Order shall report to _____ no later than _____ for deployment to Kabul, Afghanistan.

All of the requirements in Section B of the Agreement for Recruiting Services must be met. A copy of the offer letter for these positions is attached.

5

## EXHIBIT B

# TCN POSITIONS AND QUALIFICATIONS

### Guard:

* At least 21 years of age
* Fluent in English (Level 2)
* Minimum of 3 years of military, similar police, or local guard force experience
* A current passport from country of origin
* Able to obtain a valid, current local or international driver's license
* Acceptable personal, and if appropriate, military record
* Meet professional conduct, health, and appearance requirements
* Up-to-date inoculations for international travel in areas in which service will be performed

### Senior Guard:

* Fluent in English (Level 3)
* Minimum of 5 years of mid-level military, similar police, or local guard force supervisory experience 3 years of which were at the NCO or equivalent level
* Proficient in access control procedures of vehicles and pedestrians
* Knowledgeable of proper patrol procedures
* Skilled in operating two-way communication devices
* Experienced in physical security and access control matters

### Dispatcher/Guard:

* Fluent in English (Level 3)
* Minimum of 3 years of military, similar police, or local guard force experience
* An operating record without significant traffic violations or accidents during the preceding 5 years and during the period of performance of this contract
* Proficient in operating and monitoring of communications equipment
* Experience in dispatching
* Able to obtain license in Afghanistan for all vehicles required under this contract
* Familiar with physical security and access control matters
* Proficient in defensive driving techniques

6

# Language Proficiency Requirements

Required Language Proficiency Levels (as outlined in the employment qualifications 4.g.) are defined as:

# Speaking Level 2 (Limited Working Proficiency)

Able to satisfy routine social demands and limited work requirements.

- Can handle routine work-related interactions that are limited in scope
- In more complex and sophisticated work-related tasks, usage generally disturbs the native speaker
- Can handle with confidence, but not with facility, most normal high-frequency social conversational situations, including extensive but casual conversations about current events, as well as work, family, and autobiographical information
- The individual can comprehend most everyday conversations, but has some difficulty understanding native speakers in situations that require specialized or sophisticated knowledge
- The individual's utterances are minimally cohesive to articulate basic concepts
- Linguistic structure is usually not very elaborate and not thoroughly controlled; errors are frequent
- Vocabulary use is appropriate for high-frequency utterances, but unusual or imprecise elsewhere

# Speaking Level 3 (General Professional Proficiency)

Able to speak the language with sufficient structural accuracy and vocabulary to participate effectively in most formal and informal conversations on practical, social, and professional topics.

- Nevertheless, the individual's limitations generally restrict the professional contexts of language use to matters of shared knowledge and/or international convention
- Discourse is cohesive
- The individual uses the language acceptably, but with some noticeable imperfections; yet, errors virtually never interfere with understanding and rarely disturb the native speaker
- The individual can effectively combine structure and vocabulary to convey his/her meaning accurately
- The individual speaks readily and fills pauses suitably.
- In face-to-face conversation with natives speaking the standard dialect at a normal rate of speech, comprehension is quite complete
- Although cultural references, proverbs, and the implications of nuances and idiom may not be fully understood, the individual can easily repair the conversation
- Pronunciation may be obviously foreign
- Individual sounds are accurate; but stress, intonation, and pitch control may be faulty

7

## EXHIBIT C

## APPLICANT EMPLOYMENT PACKAGE

"Recruiter" gives candidates for Key Personnel positions hard-copies of MVM new-hire forms for completion:

- MVM-Kabul *Employment Package Checklist*
  - ➢ MVM Form 300-4, *Employment Application*
  - ➢ MVM Form 300-4F, *Employment Application (for non-US personnel)*
  - ➢ MVM Form 300-25, *Authority for Release of Information*
  - ➢ MVM Form 200-3, *Drug Free Workplace and Drug Testing Acknowledgement Statement*
  - ➢ MVM Form 300-24, *Consent for Use of Photographic Materials*
  - ➢ MVM Form 300-29, *Emergency Data Form*
  - ➢ MVM Form 500-5, *Direct Deposit Request*
  - ➢ MVM Form 500-14, *Notice Regarding Paycheck Deductions*
  - ➢ MVM Form 700-1, *Standards of Conduct and Appearance Standards*
  - ➢ List of MVM *Pay Periods and Pay Dates*
  - ➢ MVM Policy Statement, *Equal Employment Opportunity*
  - ➢ MVM Sexual Harassment Policy & Acknowledgement
  - ➢ MVM *E-mail Policy Acknowledgement Form*
  - ➢ MVM Memorandum, *Notice Regarding Official Use of Telephones*
  - ➢ MVM Policy Statement, *No Fraternization*
  - ➢ MVM Policy Statement, *Involvement in Unlawful Activity*
  - ➢ MVM Policy Statement, *Inquiries from Outside Organizations and Individuals*
- MVM *Employment Agreement* for specified (named) position

"Recruiter" simultaneously provides applicant with paperwork to initiate MRPT investigation process:

- MVM-Kabul *Security Package Checklist*
  - ➢ MVM letter, Subj: Instructions for MRPK Processing (w/2 attachments)
    - ○ *Guidelines for Completing Your Security Package* (with Checklist)
    - ○ *Instructions for Use of EPSQ 2.2 (Subject Version) for ESF-Kabul Applicants*
  - ➢ DoS *Checklist for Moderate Risk Public Trust ... Positions*
    - ○ Instructions to read before completing SF-85P
    - ○ DS-4002, *Disclosure and Authorization Pertaining to Consumer Reports*
    - ○ DS-7601, *Authorization to Conduct Criminal History Inquiry for Spouse or Cohabitant*
    - ○ *Foreign Relatives...* spreadsheet
    - ○ *Overseas Activities Contact Data Sheet*
    - ○ Gov't of Canada *Authority for Release of Information* (if needed)
  - ➢ DoS-furnished FD-258, *Applicant* fingerprint cards (2)
  - ➢ Blank SF-85P, *Questionnaire for Public Trust Positions*
  - ➢ Blank SF-85PS, *Supplemental Questionnaire for Selected Positions*

8

## EXHIBIT D

## KABUL ESF
## Recruiting and Support Functions to be performed by 3D

### PRE - DEPLOYMENT:

1    Recruit Candidates

Recruit
Vet per RFP
Resume preparation per RFP
Clearance package preparation per RFP
Employment package preparation

2    Contractual Requirements

Medical exam
Drug Test
Inoculations

3    Deployment Readiness

Establish bank accounts
Get passport for candidate (if necessary)
Assist with necessary visas (as necessary)
All pre-deployment contact with employees
Orientation meetings (MVM will attend)
Assist with travel plans to Kabul as necessary
(MVM will make actual flight reservations)
Travel arrangements to airport
Supervise movement
Hold formation at airport
Supervision from Lima to Kabul (senior guards
assigned to supervise travel movement)
Assist/advise MVM on any matters related to smooth
deployment

### POST - DEPLOYMENT

4    Family Support
after deployment

"Hot Line" for guards and families
Peruvian attorney on staff
Access to Guard bank accounts
"walk in hours" at local office
Private email account
Internet kiosk available
Status emails to families
Dedicated website for guards
Facilitate sending of care packages
Host a monthly luncheon
Casualty notification

9

## EXHIBIT E

### Fee Schedule

|   |                          | Fee   | Comments |
|---|--------------------------|-------|----------|
|   | **ONE TIME TASKS:**      |       |          |
| 1 | Recruit Candidates       | $300  |          |
| 2 | Contractual Requirements | $70   |          |
| 3 | Deployment Readiness     | $330  |          |
|   | **TOTAL RECRUITING FEE** | **$700** |       |

**ONGOING SUPPORT:**

| 4 | Family Support after deployment | $360 | $30 per month per person |
|---|---------------------------------|------|--------------------------|
|   | **TOTAL ANNUAL SUPPORT FEE**    | **$360** |                      |

Notes:

"Recruiting fee"
Covers all tasks shown up to and including deployment
(see task categories 1,2, and 3)
Fee is paid per deployed person

"Annual Support Fee"
Covers ongoing support as described (see task category 4)
Fee based on number of persons deployed in a given month

10

Sep 29 05 01:04p    3D Global Solutions Inc    866-238-6761         p.1

09/29/05  08:32 FAX 703 827 0780       MVM INC.                          @006

## EXHIBIT A

### TASK ORDER

In accordance with the Agreement for Recruiting Services dated September 26, 2005 by and between MVM and 3D, MVM hereby instructs 3D to recruit TCNs to fill the security personnel positions listed below:

Number of TCNs                           Type of Position to be Filled

65                                        TCN Guard

TCNs covered by this Task Order shall report to *Jorge Chavez International Airport, Lima, Peru* on or about *10 November 2005* for deployment to Kabul, Afghanistan.

All of the requirements in Section B of the Agreement for Recruiting Services must be met.

**AGREED:**

MVM, INC.

Signature:

Name:       ROBERT L. RUBON

Title:      Senior Vice President

Date:       29 SEPT 05

**3D GLOBAL SOLUTIONS INC**

Signature:

Name:       Mike Dodd

Title:      CEO

Date:       9/29/05

Oct 04 05 12:15p    3D Global Solutions Inc    866-238-6761        p.1

## EXHIBIT A

## TASK ORDER

**Task Order Number: 002**

In accordance with the Agreement for Recruiting Services dated ~~September 26~~ Oct 4, 2005 by and between MVM and 3D, MVM hereby instructs 3D to recruit TCNs to fill the security personnel positions listed below:

Number of TCNs                          Type of Position to be Filled

145                                     TCN Guard
 20                                     TCN Senior Guard

TCNs covered by this Task Order shall report to *Jorge Chavez International Airport, Lima, Peru* on or about *10 November 2005* for deployment to Kabul, Afghanistan.

All of the requirements in Section B of the Agreement for Recruiting Services must be met.

**AGREED:**

MVM, INC.

Signature: _____

Name:       ROBERT L Rubon,

Title:        S VP

Date:        03 OCT 05

**3D GLOBAL SOLUTIONS INC.**

Signature: _____

Name:       Mike Dodd

Title:       CEO

Date:        10/4/05