**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| 3D GLOBAL SOLUTIONS, INC.          * | |
|       Plaintiff                                    * | |
| vs.                                                       *  | Case No. 1:06cv00722(GK) |
| MVM, INC.                                           * | |
|       Defendant                             * | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

The basic premise of the contract at issue between Plaintiff, 3D GLOBAL SOLUTIONS, INC. ("3D"), and MVM, INC. ("MVM") (the "3D Contract"), is that 3D would provide fully qualified third country nationals ("TCNs") as security guards to guard the U.S. Embassy in Kabul, Afghanistan. It is disingenuous – at best – to allege that by merely submitting a TCN's application to the Department of State, means that MVM has waived any deficiency in the qualifications of such TCN.

Under the terms of the 3D Contract, MVM relied on 3D to locate, test and qualify the TCN applicants. MVM had every right to expect that 3D would abide by the terms of the 3D Contract.

MVM's employment and deployment of the TCNs was based on the certification by 3D that the TCNs were fully qualified. Failure to provide qualified TCNs constituted a breach of the 3D Contract.

## STANDARD OF REVIEW

Your Defendant, MVM, INC., agrees with Plaintiff's statement as to the law with respect to Summary Judgment.

**STATEMENT OF FACTS**

The 3D Contract is not a subcontract to the contract that MVM entered into with the U.S. Government (the "Afghanistan Contract"). The Plaintiff has no rights or privileges under the 3D Contract to any rights or privileges under the Afghanistan Contract. The Plaintiff, 3D, was hired specifically to recruit qualified TCNs for MVM. Payment by MVM to 3D is conditioned on the performance by 3D of the terms of the 3D Contract.

It was incumbent on 3D to provide qualified candidates as TCNs. In fact, 3D certified and warranted that each TCN met each of the qualifications set forth in Paragraph B and Exhibit B of the 3D Contract.

The TCNs supplied by 3D failed to meet basic English proficiency. An independent company hired by MVM conducted English proficiency tests on the TCNs. See Report of Testing, which is a grading synopsis of notes and recordings of the testing procedures. (See Exhibit 2)

Your Defendant, MVM, points out to this Honorable Court that the Affidavit submitted by Counsel from Jaysen Turner is at best an innocent misstatement of Mr. Turner's knowledge and participation in the selection process for the TCNs. (See Exhibit 6, Jaysen Turner Deposition)

Mr. Turner acted only in the capacity of someone collecting and collating information on the TCN applicants. Mr. Turner and Michael Dodd, President of 3D, worked at a J.W. Marriott Hotel in Lima, Peru, putting together and collating the TCN applications. Any interviews and written applications and testing, if any, of TCN applicants occurred at some six to ten different locations on different days in and around

Lima and not at the J.W. Marriott Hotel. Mr. Turner never participated in any interviews of TCN applicants and did not pass on the qualifications of any TCN applicant. (See Jaysen Turner Deposition 1-77, specifically pages 35 through 39). Furthermore, Mr. Turner had no authority to accept any TCN applicant on behalf of MVM

To suggest or even intimate that Mr. Turner interviewed and spoke with each TCN applicant and passed on such TCN applicant's qualifications is a serious misstatement of the facts and evidence.

## LEGAL ARGUMENT

### A. PLAINTIFF HAS NOT MET ITS OBLIGATIONS UNDER THE CONTRACT FOR PAYMENT

The Plaintiff, 3D, now asserts that, not withstanding the fact that the TCNs were egregiously unqualified with respect to their English language proficiency, MVM waived the very essence of the 3D Contract by submitting the TCN's application packages to the Department of State.

At no time prior to deployment, did MVM undertake any study as to the background or qualifications of the submitted TCNs. Under the terms of the 3D contract, it was the Plaintiff's obligation to provide qualified TCNs and certify and guarantee their qualifications under 3D Contract.

In fact, Counsel's argument flies in the face of the deposition testimony of Michael Dodd, the President of 3D, at Page 82-83:

> Q:   *Notwithstanding what Wackenhut said to you or promised you, you certified to MVM that these applicants, future employees of MVM, met the requirements of their (MVM) contract with the government.*

>A:   *Yes, and if they were unhappy with anyone, I would replace them at no cost.*

At Page 99:

>Q:   *You certified that everybody you sent forward was qualified.*
>
>A:   *Correct.*

Previously at Page 31 in answer to a question about Guarantees:

>A:   *Oh yeah, the same I provide: a 100% replacement guarantee. So if the client was unhappy with a single candidate, or all of them, they could send them back to be replaced at no cost.*

And then later at Page 35: from line 9:

>Q:   *When you were advised there was a problem with the language proficiency of the TCNs?*
>
>A:   *December 5th, 7th. Around in there.*
>
>Q:   *And what did you do?*
>
>A:   *I said, Fine. Identify who needs to be replaced. Let me know their names so I can work their movement back and how many people I need to replace.*
>      *I had that conversation with Peter Rice, Rob Rubin and Tim Lynch, the project manager.*
>
>Q:   *And did you understand from --. What did you understand from each one of them? What did you understand from Peter Rice?*
>
>A:   *That there were going to be some men that needed to be replaced.*
>
>Q:   *Did he tell you how many?*
>
>A:   *No. He estimated less than 25. Tim Lynch estimated less than 15.*
>
>Q:   *What about Mr. Ruben?*

> A:  *He never gave me an answer. He just said that men were going to need to be replaced. I replied, "Great, Rob, tell me how many and I'll replace them at no cost to you."*
>
> Q:  *Weren't you advised at some time that the majority of them needed to be replaced, were not acceptable?*

(See Exhibit 7, Michael Dodd Deposition)

Michael Dodd was notified that over Eighty (80%) percent of the guards were unqualified. Mr. Dodd received verbal communications, as well as written notifications from MVM of this glaring defect in the performance of the 3D Contract. (See Exhibit 8, Letter from Robert Rubin dated December 14, 2005)

See also attached printout of English language proficiency test results for testing administered by ATLA Language Services to the TCNs. These tests were administered to each TCN and each interview/test was recorded. (Exhibit 2)

By no stretch of anyone's imagination can this be considered as performance requiring payment to 3D. At a minimum, it is an issue to be tried by a jury.

### B. THE SETTLEMENT AGREEMENT BETWEEN THE U.S. GOVERNMENT AND MVM HAS NO BEARING ON 3D'S CLAIM AGAINST MVM

Any negotiated settlement agreement between the United States Government and MVM, INC. has no impact whatsoever on whether 3D performed under the 3D Contract, by delivering qualified TCNs as security guards to guard the U. S. Embassy in Kabul.

MVM, INC. has incurred in excess of Three Million Dollars ($3,000,000.00) in unrecovered and unreimbursed losses and expenses as the result of 3D's failure to adhere to the terms of the 3D Contract, which in turn resulting in the termination of the Afghanistan Contract in December 2005 (See Exhibit 3, Affidavit of Dario Marquez, Jr.)

The rationale behind MVM's decision to accept less than Sixty percent (60%) of their out-of-pocket expenses from the U.S. Government to resolve the Afghanistan Contract is logical and is clear to understand. On December 22, 2005, MVM knew that the TCNs that 3D supplied were not qualified to assume their duties to provide security for the U.S. Embassy. MVM realized there was no way that it could prevail in any protracted litigation over this issue. MVM's own English language testing, conducted by ATLA, would prove the government's case. MVM made the rational decision to cut its losses to reach a settlement.

The fact that MVM acted prudently in resolving its claims with the U.S. Government, as well as the claims against it by the U.S. Government, does not estopp MVM from demonstrating that 3D breached the 3D Contract and seeking damages.

### C. THE DEFENDANT'S COUNTERCLAIM SHOULD NOT BE DISMISSED

The Counterclaim asserted by MVM, INC. against 3D should not be dismissed because MVM sustained real losses, including substantial out-of-pocket expenses, in excess of Three Million Dollars ($3,000,000.00). MVM's losses are in excess of the amount it received from the U.S. Government. MVM suffered a significant loss in profits on the Afghanistan Contract, as the direct result of 3D's breach of the 3D Contract.

The *Maxima* case cited by the Plaintiff does not preclude MVM from seeking anticipated profit from 3D as a result of 3D's breach. *Maxima* merely sets forth the axiom that a contractor cannot seek lost profit from the government when the U.S. Government terminates for convenience.

**CONCLUSION**

There are many disputed issues of fact in this matter. For those reasons and those enumerated above, this Court should deny the Plaintiff's Motion for Summary Judgment.

                              MVM, INC.
                              a California Corporation

                              By: /s/ Herbert S. Rosenblum, Esquire

HERBERT S. ROSENBLUM, ESQUIRE
D.C. Bar No. 093351
Counsel for Defendant
526 King Street, Suite 211
P.O. Box 58
Alexandria, Virginia 22313-0058
Telephone:  703/684-0060
Facsimile:   703/684-0072


**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of March 2008, I sent a true copy of the foregoing Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment by electronic mail and by First Class, Postage Pre-paid Mail of the foregoing Defendant's Response to Plaintiff's Motion to Compel to the following: Athan T. Tsimpedes, Esquire, 1420 New York Avenue, 7th Floor, Washington, DC 20005, and Douglas B. McFadden, Esquire, McFadden & Shoreman, LLC, 1420 New York Avenue, N.W., Suite 700, Washington, DC 20005.

           /S/_____
          HERBERT S. ROSENBLUM, ESQUIRE