IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

3D GLOBAL SOLUTIONS, INC.,
Plaintiff,

CASE NO. 1:06cv00722(GK)

-vs-

MVM INC.,
Defendant.

---

Vienna, Virginia
October 18, 2007

Deposition of
JAYSEN TURNER

called for examination by counsel for the defendant, pursuant to notice, at the offices of MVM, Inc., commencing at 10:30 a.m., before Ronald E. Johnson, CMR, and Notary Public for the Commonwealth of Virginia, when were present on behalf of the respective parties:

Reported by: Ron Johnson

APPEARANCES:

FOR THE PLAINTIFF:

ATHAN T. TSIMPEDES, ESQ.
1420 New York Avenue, NW
Seventh Floor
Washington, DC 20005
Telephone: 202-638-2100

FOR THE DEFENDANT:

HERBERT S. ROSENBLUM, ESQ.
526 King Street, Suite 211
P. O. Box 58
Alexandria, Virginia 22313
Telephone: 703-684-0060
-and-

PATRICIA L. MASKELL, ESQ.
OF: Maskell & Gaba
1197 Winter Hunt Road
McLean, Virginia 22102
Telephone: 703-893-8175

C-O-N-T-E-N-T-S

WITNESS: JAYSEN TURNER

| EXAMINATION BY: | PAGE |
|---|---|
| MR. ROSENBLUM | 5, 73 |
| MS. MASKELL | -- |
| MR. TSIMPEDES | 41 |

E-X-H-I-B-I-T-S

| EXHIBIT: | FOR IDENT. |
|---|---|

(There were no exhibits marked by the court reporter during the taking of this deposition)

tabbies' EXHIBIT 6

* * P R O C E E D I N G S * *

THEREUPON,

JAYSEN TURNER

was called as a witness, and after being first duly sworn by the notary, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE DEFENDANT

BY MR. ROSENBLUM:

Q Good morning, Mr. Turner. My name is Herbert Rosenblum. Of course, we have met, and actually had a little social conversation.

Have you ever had your deposition taken?

A No, sir.

Q All right. I'm going to ask you some questions and when you answer, I'm going to assume that you understood the questions because you have answered it. If you don't understand the question, just tell me and I will try to rephrase it. Sometimes I'm not as articulate as I want to be.

Your answers need to be verbalized. You cannot say uh-huh, huh-uh, or nod your head because our court reporter cannot take down the nods of the head.

I am going to ask you things that happened and I would like you to give me your best recollection. If you don't know, tell me you don't know.

A Okay.

Q There is nothing wrong with don't knowing and there is nothing wrong with not remembering.

A That's good because it's a long time ago and I was worried this morning, you know, my memory is not going to be as good.

Q I understand. I understand.

What is your address, Mr. Turner?

A 2534 South Walter Reed Drive, Unit B, Arlington, Virginia, 22206.

Q And what is your date of birth?

A 4-18-78.

Q And are you presently employed?

A Yes, sir.

Q Where are you employed?

A Front Line Defense Systems.

Q Can you tell us a little bit about Front Line Defense Systems and what you do for them?

A Sure. We are actually a really small

company. We are only four people. So I do a whole bunch of stuff. I do anything from creating marketing materials to -- actually what I was hired to do is work on some of our contracts which are mostly with the military. They are classified contracts. Kind of a niche service provider. We kind of do, you know, our clients give us a problem, we come up with solutions. We're kind of an integrator, you know, for real unique projects.

Q In our social conversation, you mentioned that you travel a significant amount, is that correct?

A Yes, sir.

Q And that is travel for the job, is that correct?

A Right.

Q All right. Now, how long have you worked for Front Line?

A I started my employment on August 15th, last year, but I worked as an independent contractor for about nine months for them.

Q So that would have put you working or starting with them in --

A -- January.

Q -- January of '06?

A Yes, sir.

Q And prior to that, where did you work?

A At MVM.

Q And when did you begin your employment with MVM?

A Actually I had two periods of employment. That one was approximately October of '05 to January of '06. And I had left MVM for about two months before that, and I think I originally came here in September of 2004.

Q All right. Let's start with the first period of time that you were here, September of '04.

What was your job in September of '04?

A I worked for Jack Taylor as a -- I forgot what our positions were called.

MS. MASKELL: Project analyst?

THE WITNESS: Project analyst, yes.

BY MR. ROSENBLUM:

Q All right. So you were a project analyst?

A Right.

Q Okay. And exactly, what did that entail?

A For me it entailed actually kind of coordinating the contracts that the director I worked under had at that time. They were contracts with DEA, the marshall's service, and I think we had one or two that were with the military.

Q Okay. And how long did you do this kind of work in September, from September of '04?

A I think I left in June or July of '05, and then I was gone for about two months.

Q Why did you leave?

A The director I worked under left and we got moved under somebody else, and kind of my job was changing in my tasks.

Q And it wasn't what you wanted to do?

A I think at that time, yes, I wasn't sure, and I started looking for other employment just to see what was out there that I could move to.

Q Okay. And then you came back in October of '05, is that correct?

A Yes, sir.

Q And how did it come about that you came back?

A Actually because we got the contract for

the -- I'm sorry -- MVM got the contract for the security force for Kabul, Afghanistan, and the person who had originally hired me, Clyde Slick, let me know that he would be interested in me coming back specifically to work on that contract, and it sounded like a good deal to me and I was interested -- I was really interested in working for Clyde, so I came back.

Q Okay. And tell me what you understand your duties or responsibilities were when you came back in October of '05.

A I thought I was going to come back just to be Clyde's assistant, to do whatever he needed me to do, and I thought I would actually be spending most of my time here in MVM's office. The way it turned out, I spent most of my time in Peru.

Q All right. And they sent you to Peru, is that correct?

A Right.

Q And when did they send you to Peru, if you remember?

A I don't remember the dates specifically, but it was real quick after I got back. It was a

matter of three of four weeks. My first trip down there was just actually to go down there and pick up some documents and bring them back.

Q Okay. So would it be fair to say that was like a two- or three-day trip?

A Actually I flew into Lima very early in the morning. I spent the entire day there and I flew out that night. So I think the total with traveling, it was two-and-a-half days.

Q That would have been in --

A I think approximately the end of October of '05.

Q Okay. The end of October of '05?

A Right.

Q And as I understand it -- and correct me if I'm wrong -- you went and picked up these packets that needed to be given or forwarded to the Department of State, is that correct?

A Yes, sir.

Q And do you remember how many packets you picked up?

A No, I don't. Do you want me to give an approximation?

Q Yes, if you can. If it was approximately 50, say approximately 50; if it was approximately 100, tell me that.

A I would say approximately 20 at that time.

Q All right. Were these the first packets or these were the second or third packets?

A Those were the first ones.

Q And did you meet Mike Dodd down there?

A Not at that time, no.

Q From whom did you pick up the packets?

A Mike had a guy working for him, and I have forgotten his name, and I spent the day with him.

Q John Rosenbaum?

A No. I believe his name was Adam.

Q I'm sorry.

A I believe his name was Adam.

Q Adam Rosenbaum, is that who it was?

A His name was Adam. I don't recall his last name.

Q All right. And what did you do?

A Adam and I went to the facility where they were screening individuals and filling out documents. We spent a good part of the afternoon

there. And we went through documents, or the packets to make sure they had the correct documents and had them in order. Then that night I flew out with them.

Q Okay. Can you describe the facility where they were screening or preparing these documents?

A Yes, it was an in-country security firm there that had a facility that had classrooms and offices and stuff like that.

Q And you said you took back approximately 20 applications?

A Yes, I think it was about 20. And I'm basing that on, you know, my knowledge of how big the packets were, and, actually the luggage that I was carrying, and I don't think I was carrying a huge bag or suitcase.

Q I would assume -- were these packets complete when you picked them up?

A Yes.

Q They had already been completed, is that correct?

A Right.

Q So you flew in and you arrived

approximately what time in the morning or evening?

A I think about 6:30 in the morning.

Q All right. And then you met Adam at approximately what time?

A As soon as I flew in. He was there waiting for me.

Q At the airport?

A Yes.

Q And then you went to the facility?

A No, I went to a hotel for about three or four hours, which took a while to get there from the airport, and I think Adam picked me up sometime mid-day.

Q Okay. And then you and Adam went to this facility, is that correct?

A Right.

Q And did you all go into a room, the two of you?

A Yes, sir.

Q And would it be fair to say that the 20 or 30 applications, whatever they were, were on the table?

A Yes.

Q Okay.

A There were 20 or 30 that were on the table that were completed, and then there was quite a few people there that were actually --

Q Collating?

A Right.

Q In other words, they were putting them together?

A Yes. He had plenty of people working for him, and actually then what I was getting at, there was plenty of people there that were continuing to, you know, fill out documents.

Q But that was in other areas of the room or in another room?

A No, it was in the same room. It was a room that was probably 40 feet by 30 feet.

Q All right. And the folders that were there, the applications that were there that had been completed when you arrived there, you know, in the early afternoon, did you review them or did you just put them into your carry-on?

A No, I just put them into my bags. I helped a little bit as far as putting the documents in the

right order.

Q A, B, C, D?

A Right.

Q In other words, the attachments in the correct order?

A Right.

Q All right. And then you came home, is that correct?

A Yes, sir.

Q All right. So basically you were a courier?

A Yes.

Q Is that the word I wanted to know?

A Yes.

Q You were a courier.

A Yes.

Q Thank you. That's exactly what I wanted to know. You were a courier.

So now you are back in the United States. And how long were you here?

A I believe I was here for about a week, possibly two.

Q Now, when you went there the first time,

did you inquire of Adam how they were putting these things together?
A I'm sorry?
Q Did you inquire of Adam how they were putting these packages together?
A As far as the order that they were putting them in or how they were accumulating the information?
Q How they were accumulating the information.
A No, I didn't ask him about, you know, exactly what the process was. I looked around the room and I saw people, I saw people that worked with Adam working with applicants.
Q Okay. Were they completing the questionnaires in Spanish or in English, do you know?
A I don't know.
Q All right. Did they ever have an application that had been translated into Spanish from English?
A No, I don't believe so.
Q You don't know or you don't believe so?

A I don't know.
Q Okay. So now you brought the applications back to the United States and you are here approximately a week, is that correct?
A I think it was about one to two weeks, yes.
Q And that would take us into what time frame?
A I guess early September.
I'm sorry. November.
Q Early November?
A Yes.
Q Now, did you go back to Peru?
A Yes.
Q When did you go back?
A Like I said, approximately one to two weeks after I went the first time.
Q All right. So that would have have taken you back in the second week of November? Would that be right?
A No, I think that's going back to the very beginning of November. Yes, because I believe I made two or three trips, you know, in November

alone.
Q Okay. So now you go back in November the second time, is that correct?
A Correct.
Q And how long did you stay when you went back the second time?
A I believe I stayed about a week.
Q And did you meet Mr. Dodd then?
A Yes, sir.
Q Okay. And as I understand it, Mr. Dodd stayed at the Marriott, is that correct?
A Yes, sir.
Q And you stayed at the Marriott?
A Yes, sir.
Q Okay. And did the two of you work at the Marriott?
A Yes, sir.
Q And as I understand it, you -- the applications would come into, was it your room or Mr. Dodd's room?
A Actually neither.
Q It was a work space that you had?
A Yes, sir.

Q And it was secure?
A Yes, sir.
Q So the two of you would work in the work space, is that correct?
A Yes, sir.
Q Collating the applications?
A Yes, sir.
Q Now, did anyone else work in that work space other than the two of you?
A There were -- it was a -- it was like a lounge area for -- executive lounge type of thing, and most of the time when we were in there, I believe it was just the two of us; at other times at other sides of the room, there were people that were guests there.
Q So basically when the two of you were working, you were working -- did you have a table?
A Right.
Q You were working on the table, and then when you completed your work that time, day or hour, you would pick up the documents and take them where?
A To one of our rooms.
Q Okay. And so during that week, would it

be fair to say that you and Mr. Dodd collated a substantial number of applications?
A Yes, sir.
Q All right. And would that be approximately how many?
A I don't know. I don't remember. It was -- if you want me to guess, I can. I would say approximately between 70 and 100.
Q Okay. I don't want you to guess, but if you can approximate, that's different. Okay.
A guess is too far out; approximation is fine.
A It was approximately 70 to 100.
Q Okay. And how long did it take you to collate these applications?
MR. TSIMPEDES: Can I object for a second?
Can we just define what you mean by collate, because I don't --
MR. ROSENBLUM: Putting them together.
BY MR. ROSENBLUM:
Q I assume you had the forms and then you had to put the attachments for Mr. Rodriguez, Mr. Lopez and whatever, is that correct?

A In large part, the way it worked was they were semi-collated.
Q Right.
A We completed that and also ran through to see that all information was there.
Q And appropriately filled out?
A Yes.
Q Okay. So you were there a week, and you and Mr. Dodd worked on this together?
A Yes, sir.
Q Did anyone else assist you in the Marriott?
A No.
Q All right. And how long would you work on a daily basis there, approximately?
A Eight hours.
Q Okay. Now, when you finished an application, you put it to the side, is that correct?
A Yes.
Q Now, were additional applications brought to the Marriott --
A Yes, sir.

Q -- as you all went through the group that you had?
A Can you --
Q In other words, after you had finished eight or nine or ten, did someone else bring you another eight, nine or ten?
A Yes, but what restricted our work flow, was, you know, we would have a bunch, get through them, and have to wait a little bit for others to show up, because they were being -- the facility I explained to you before or described to you before was on the other side of Lima.
Q Okay. So basically then, the applications came to you.
A Yes, sir.
Q Someone brought them from, was it an hour away?
A By taxi, it was about 30, 40 minutes.
Q Okay. Now, I understood when we took the previous deposition of Mr. Dodd that there were like five or six areas or locations that they were interviewing these people. Do you know that or not?
A I guess five or six -- I mean, do you mean

five or six locations across Lima or five or six locations in that facility?
Q Across Lima.
A Not that I'm aware of.
Q Okay. But all the information, wherever it came from, was going initially to the facility and that was approximately an hour away from the Marriott, is that correct?
A Yes, sir.
MR. TSIMPEDES: Objection.
BY MR. ROSENBLUM:
Q And they were putting it together and then it was coming to you, is that correct?
A I'm sorry. Can you --
Q All the information, wherever it came from, was being handled in the facility where the people were typing up documents, doing initial collating of the documents, and then they would send it to you at the Marriott, is that correct?
MR. TSIMPEDES: Objection.
MR. ROSENBLUM: On what basis?
MR. TSIMPEDES: Well, you have to have first-hand knowledge of it. He's at the hotel. How

does he know what's coming to him?

MR. ROSENBLUM: Well, I'm just asking him.

MR. TSIMPEDES: That's fine. That's why I'm objecting.

MR. ROSENBLUM: Okay.

BY MR. ROSENBLUM:

Q Is that how it was working, Mr. Turner?

A As far as I know.

Q Okay. All right. So now after a week, you had approximately another 70 to 100 applications that were ready to go to the State Department, is that correct?

MR. TSIMPEDES: Objection. Leading question.

MR. ROSENBLUM: Fine.

BY MR. ROSENBLUM:

Q Is that correct?

A After a week --

Q -- you had another 70 to 100 applications?

MR. TSIMPEDES: Same objection.

THE WITNESS: Am I supposed to answer?

MR. ROSENBLUM: You are supposed to answer.

The only thing is if I ask you, do you still beat your mother, you can tell me no to that, you don't have to answer that, but any other question, you have to answer.

THE WITNESS: Yes, I believe I was there for a week and I believe I returned with 70 to 100.

BY MR. ROSENBLUM:

Q Okay. Now, how long were you back in the United States, approximately?

A I don't remember. Not very long. During my employment with them during that time, I spent very little time back here.

Q Okay. So now you are here and then you return again to Peru, is that correct?

A Yes, sir.

Q All right. And this would be your third trip to Peru, is that correct?

A Yes, sir.

Q And that would be approximately when?

A Mid-November.

Q Okay. And I would assume that the records of MVM would show your flights back and forth?

A I would think so.

Q So if you're off a week one way or the other, it doesn't really matter.

So now you go down the third time. Are you again staying at the Marriott?

A I don't remember. During my time there, I stayed at three or four different hotels.

Q All right. Your third trip down there, did you work again with Mr. Dodd?

A I don't remember if he was there that time or not.

Q Okay. Well, who would you have worked with putting the applications together?

A I worked with two of his assistants.

Q Okay. And you don't know if that was the third or fourth time, but one time you worked with two of his assistants, is that correct?

A Yes.

Q And what were their names?

A One of their names was Isaura.

Q Can you spell that please?

A I-S-A-U-R-A.

Q Okay. Is that a female?

A Yes.

Q All right. And you don't know her last name?

A No, I don't remember her last name.

Q Okay.

A Actually -- I'm sorry -- I do. Marca. I guess M-A-R-C-A. I don't recall.

Q And the second person?

A Deborah. I don't recall her last name.

Q Okay. Isaura, was she a Peruvian?

A Yes.

Q All right. And Deborah, was she an American or a Peruvian?

A Peruvian.

Q Okay. And they were employees of 3D, is that correct?

A Yes, sir.

Q And did you again work in a hotel environment, hotel room environment?

A We worked in the same area that Mr. Dodd and I worked in.

Q All right. So in other words, it was a conference room or whatever it was?

A Yes, it was an executive lounge at the

J.W. Marriott.
Q Okay. And the process worked the same way, is that correct? In other words, the applications would come from the processing center and they would come across town and you would put them in -- they would come to the Marriott or another hotel, and this time the three of you would work on them together, putting them together --
A Yes, sir.
Q And then you would courier them back to the states, is that correct?
A Yes, sir.
Q All right. And this being your third trip, and this being sometime towards the end of November, approximately how many did you courier back?
A I don't recall.
Q Can you estimate?
A I don't know how accurately I can. I had quite a few. I had a suitcase full of them.
Q Would it have been as many as you had the second trip, 70 to 100?
A I think approximately that. About the

same amount. Maybe a little bit less.
Q All right. And again you acted as a courier?
A Yes, sir.
Q And you brought them back.
A Yes, sir.
Q Did you ever go back a fourth time to Peru to help collate additional applications?
A No, I -- well, yes, I did, to continue in that, but at some point the function of me going back had changed and instead of getting everything back and stuff like that, we started actually putting Peruvians on planes and sending them out.
Q Okay. So there came time when you instead of acting as someone who was putting the packages together and making sure all the appropriate attachments were attached to each application --
A Uh-huh.
Q -- and then acting as a courier and bringing them back, there came a time when the Peruvians were actually getting on planes and going to Kabul?
A Right.

Q All right. And that was your next job function, is that correct?
A Yes, sir.
Q And were you given this job by Mr. Slick or is that what he told you he wanted you to do, or did somebody else give you that instruction?
A No, I -- well, I took some of my direction from Clyde, but he was traveling quite a bit as well, and in place of him, I was taking directions from Rob Rubin and Peter Rice.
Q All right. Now, when do you -- to the best of your recollection, when did the Peruvians start shipping out from Lima to Kabul, to Afghanistan?
A The date that sticks in my mind is the first pax lift we had which was 23 or 24 of November.
Q Okay.
A And I don't know that it's the exact date.
Q Before or after Thanksgiving?
A Before.
Q Okay. And do you know approximately how many got on the plane?

A I don't remember how many we had on the first plane.
Q Okay.
A I think on the first plane we had 40 or 45, and then pretty quickly after that we had another pax lift of about the same amount.
Q Okay. Did you fly with them to --
A No, sir.
Q So you stayed on the ground?
A Yes, sir.
Q All right. And when you helped them get on the plane, tell me what you did, what your duties were.
A Mike Dodd had another person down there that worked for him down there and I was assisting that person.
Q Okay.
A So we -- and we had a manifest approximately a week before each pax lift, and then we had another manifest the day before.
Q Was that Sgt. Major Sousa?
A Yes, sir.
Q Okay. So he was the one that was putting

them on the plane?
A Yes, sir.
Q And you would do whatever he told you to do?
A Yes, sir.
MR. TSIMPEDES: Objection.
BY MR. ROSENBLUM:
Q All right. And what were some of the things you did to assist him or to facilitate the movement of the Peruvians to Kabul?
A Well, we were coordinating, like I said, the manifests, and, you know, we were coordinating, you know, anything it took to get these guys to the airport, buses, and then we spent quite a bit of time in the airport with them.
Q Making sure they all got on the plane.
A Yes, sir.
Q And making sure none of them walked out the front door, or the back door.
A Yes, sir.
Q Okay.
A And most of these guys had never traveled internationally before, so we spent time, you know,

making sure everything was set for that as well.
Q And most of them probably had not ever been on a plane before.
MR. TSIMPEDES: Objection.
THE WITNESS: I am not aware.
BY MR. ROSENBLUM:
Q Okay. So now we have shipped out the first group which you estimate to be approximately 40 people, and you estimate that was right before Thanksgiving, the 23rd or 24th of November, is that correct?
A Yes, sir.
Q All right. Approximately when did the next group go out?
A The day after the first group went.
Q Okay. Was that the same, approximately the same number?
A Yes, sir.
Q And the next group, do you remember when the next group went out?
A I don't remember.
Q Mr. Turner, did you ever see the contract itself with the -- MVM's contract with the State

Department?
A I believe I did. Yes.
Q All right. And did you ever see MVM's contract with 3D?
A No, I don't recall ever seeing that.
Q Do you know what the requirements were with respect to the English language ability of the Guard Two's or do you know what the requirement in the contract was?
A I don't remember what the requirement in the contract was specifically between MVM and 3D.
Q Or MVM and the State Department?
A I can't recall exactly what the requirement was, no.
Q Okay. Did you ever see any testing of marksmanship of any of the applicants on the documents that you sent forward?
A No.
Q Did you ever see any or hear of any testing as to their English abilities?
A No, because I didn't spend time -- only that afternoon at the place where they were screening people.

Q You didn't participate in the screening of people?
A No.
Q So that was really your only time that you went to the screening facility, is that fair?
A Yes, sir.
Q And then would it be fair to say that you accepted the application, whatever the application said, you accepted it on its face?
A Yes, sir.
And if I can back up a second. I did actually visit that location one other time quite a few weeks later and it was to coordinate with somebody there about getting smaller bills in cash so I could pay for exit fees at the airport.
Q All right. So really the only trips to that facility were, one, just standing around for an hour, just visualizing what was going on --
MR. TSIMPEDES: Objection.
BY MR. ROSENBLUM:
Q -- and the second time was to go and to facilitate the exit of these people from Peru to get some cash so you could help them on the plane?

A Yes, the second time, that is correct.
The first time I'm sure I looked around, but I wasn't there to -- I wasn't there to check up on things, I was there to pick up packets. And before I went to that facility, I didn't know that I was going to be going in that facility.
MR. TSIMPEDES: Mr. Rosenblum, could you let him finish his answer before you help him out?
MR. ROSENBLUM: I'm not helping him out.
BY MR. ROSENBLUM:
Q Did there come a time, Mr. Turner, when you learned that there was a problem with the ability of the guards to speak and understand English?
A Yes, I was aware of that at some point.
Q And do you remember when you became aware of that?
A I remember it being much later than I thought it would have come up, and I don't recall exactly when, but I think it was well into December before I realized that that was an issue, or before I learned that that was an issue.
Q Now, did MVM send you back to Peru when

they realized that there was a problem with the English speaking and understanding ability of the guards?
A I don't remember if they sent me back or if I was already there. I spent time in Peru into the second week in January.
Q And during that visit whenever it was, did you take a more hands-on approach to the guards and their ability to speak English?
Let me back up and withdraw that question.
Were tests then performed in either December or January, December of '05 or January of '06, with respect to prospective employees?
A There was a point where we started -- yes, we were going to implement a phone test that MVM was coordinating up here with a company out of Atlanta, I believe.
Q And that was for the guards who were in Peru?
MR. TSIMPEDES: Objection.
BY MR. ROSENBLUM:
Q Is that correct? When you were there?
A I think that they had the guards in

Afghanistan calling in to take a test, and I was in the -- I was coordinating for that to happen for guards in Peru.
Q Okay. And were tests given to the prospective guards in Peru?
A No.
Q Did you determine that -- did you interview any of the guards in Peru after this issue of English fluency came up, prospective guards in Peru?
A I didn't set up interviews to, you know, check on their English capabilities. I had certainly talked to some of them.
Q And did you determine that most if not -- did you determine that most of the people in the 3D pipeline were not sufficiently fluent in English to handle the guard duties?
A No, I couldn't make that determination because I didn't know what sufficient was.
Q Okay.
A To me, the language capability at that point when I started, when I realized that, you know, there is a language issue, the requirement was

vague. I didn't know how to label somebody a Level 2, Level 3, Level 4 English speaking.
Q So that would have been up to an expert?
A Right. And at that point, MVM, Rob Rubin, at least, told me not to go any further with coordinating them taking a test with, you know, the company out of Atlanta because they were going to try to figure out what they were going to do up here.
So interviewing any of them for their language capability, I didn't see that it was something that I was supposed to be doing.
Q Okay. You are fluent in Spanish, aren't you?
A I'm not fluent. You know, I studied it in Cuba so I spoke pretty well. I understood pretty well. I lost it for quite a bit. You know, I went to Peru and I started -- it came back real quickly. I'm not sure I could order a beer now.
Q Corona?
A Right.
MR. ROSENBLUM: Can we take a five-minute break, please?

MR. TSIMPEDES: Sure.

(Short recess)

MR. ROSENBLUM: Back on the record.

I have no further questions.

MR. TSIMPEDES: I just have some brief questions.

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. TSIMPEDES:

Q When you were in Peru, Mr. Turner, did you have the opportunity to hear the guards that were being sent to Peru speak English?

A Yes, when we were coordinating pax slips and stuff, I had the opportunity to hear them speak English.

Q Did you find their English abilities to be appropriate for the positions that they were heading to?

A The ones I heard speak English, yes, but there were quite a few of them, like I said, I didn't interview them or I didn't screen them personally or anything.

Q How many would you say you screened?

MR. ROSENBLUM: He didn't screen any. He

said he didn't screen any.

MR. TSIMPEDES: That's not what he said. He can testify to what he said.

MR. ROSENBLUM; I don't want you putting words in his mouth.

MR. TSIMPEDES: Mr. Rosenblum, he can testify as to what he said. If there's any discrepancy with my questions to you, Mr. Turner, please state that. I'm not going to have Mr. Rosenblum interrupt the deposition and try and coordinate what he wants you to say. Rather, if there is a discrepancy in my question to you, if you feel that it is not stated correctly in any fashion, please state so.

THE WITNESS: I believe I said I didn't screen any of them. I had conversations with some of them, yes.

You know, I had conversations in both English and Spanish with plenty of them. And like I said, I wasn't there to screen them, and before I knew that there was a language issue -- you know, many of the conversations I had with some of them, I was probably wanting to work on Spanish. That was

an opportunity. Some of them I spoke English with.

Q Prior to today, did you speak with Mr. -- prior to me entering this room here, did you have an opportunity to talk to Mr. Rosenblum?

A Yes.

Q When did that occur?

A I'm sorry. I thought you meant right before you walked in.

Q Sure.

A We had a social conversation.

Q And before that, did you have an opportunity to talk to Mr. Rosenblum?

A I spoke with him on the phone yesterday. He called to remind me of the time and date. And I think I spoke to him once before when we were trying to coordinate a date.

Q At any point in your conversations with Mr. Rosenblum, did you discuss the subject matter?

A No, sir.

Q Did anyone in Mr. Rosenblum's office talk to you about the subject matter of your deposition?

A No, sir.

Q Did anyone from MVM contact you prior to

this deposition?

A No, sir.

Q Would you agree that when on your second trip down there, you were at the facility, correct?

A My first trip down there, I went to the screening facility.

Q Okay. The first trip down there.

A Yes.

Q You were at the screening facility.

A Yes.

Q And what were they doing at the screening facility? When I say what were they doing, I'm referring to obviously this is 3D processing Peruvian guards for the contract with MVM, is that correct?

A Yes.

Q Could you describe whether they were processing screening of Peruvians at that time?

A 3D had a handful of employees and I would guess around ten there, and some of them were in one part of the room collating and putting documents in order, and then some of them were what I understood to be screening applicants.

Q When they were screening the applicants, were they speaking in English?

A I don't know. I was on the other side of the room, and I didn't know that I was down there to monitor anything, so I didn't, you know. I didn't think to be paying any attention to that.

Q Did you find anything in your time in Peru that would indicate that 3D was not complying with any of the agreement provisions that it had?

MR. ROSENBLUM: Objection. That's not for him to determine.

BY MR. TSIMPEDES:

Q You can answer the question.

A There was nothing I noticed.

Q When you went over documents with Mr. Dodd, did you have any concerns?

A No, sir.

Q Did MVM have any concerns with the work that was being done by 3D Global regarding the Peruvians at any time on your first trip?

A Not that I was aware of, no.

Q The same question on your second trip.

A No, I think the reason I went down there

on the second trip was to help go through the packets and put them in order and I think provide somewhat of an MVM presence, though I was only working with Mr. Dodd, so I guess that may have come out as some kind of concern they had, that, you know, they sent me down there to help Mike go through and help put stuff in order. Other than that, I'm not aware of any concerns.

Q And you did help Mike with the concerns that MVM had, isn't that true?

A Yes, I helped him put documents in order and bring them back up.

Q And did you feel that the documents you brought back were adequate and sufficient?

MR. ROSENBLUM: Objection. He brought back documents that were provided by MVM -- I mean, 3D. That's all.

THE WITNESS: As far as I knew, they were sufficient.

BY MR. TSIMPEDES:

Q Did MVM tell you they were not sufficient at any time?

A No.

Q On your third trip down there, would you agree you assisted -- although Mr. Dodd wasn't there, you assisted 3D Global, and I believe you mentioned two of Mr. Dodd's assistants?

A Yes, I did. And I don't remember if he was there that time. He may have been the first part of that trip down there and we worked with his assistants, and then after he left, I continued to work with his assistants.

Q And you brought back documents provided by 3D Global to MVM?

A Yes.

Q On your third trip.

A Yes.

Q I mean, you said you did on every one of the trips, but I'm now talking about the third trip.

A There was a -- and it may have actually been the third trip that I was down there that one other MVM employee came down, and it was one of Rob Rubin's employees that came down and spent one day much like I did on the first trip down there, to pick up packets and bring them back because I couldn't come back. I was down there coordinating

our pax list.

Q I'm sorry. You were coordinating what?

A I was helping -- that's when I was there helping to coordinate, you know, the first groups of guards to be flown --

Q To your understanding and knowledge, did MVM have a concern of the fluency of English regarding the Peruvian guards when you went down to Peru at any time?

A No, until -- I was already down there when I learned of a concern for language.

Q And that was in January of 2005?

A No, that was the end of December actually. I think I learned of it right before Christmas actually.

Q Okay. But prior to that, MVM did not ask you, request of you in any way -- strike that question.

Prior to being informed right before Christmas of 2005, MVM did not raise an issue with you about English competency of the Peruvian guards?

A No, they didn't.

Q As a matter of fact, isn't it true --

strike that question.
Would it be fair to say when the Peruvian guards that you witnessed and assisted to get on the plane and were shipped to Afghanistan, at no time prior to that did MVM signal to you or request of you that the Peruvian guards did not adequately speak English for their job position?
A I'm sorry. Can you repeat that last question?
Q Sure.
Let me go back. Let me go to the first shipment.
I'm going to go by shipment of the Peruvians. I think there were three shipments, maybe more, that you were involved in.
A There was -- you know, you might consider our shipment being our first groups of guys because they went -- I sent two groups, you know, on two consecutive days, or something -- or with one day in between. There were two -- our initial groups that went out, there were two that went, one was, say, a Tuesday, and the other was either Wednesday or Thursday. And then we had another, I believe

another two groups go in the same fashion, and I don't recall if there was another group, or if that was -- no, in fact, there must have been another one, but I don't recall exactly when it was.
Q When you -- and you would assist these Peruvians on the plane, is that correct?
A Yes, at the airport. I would get them to the plane.
Q And to your understanding, what did these Peruvians do when they reached Afghanistan?
A I believe they were picked up at the airport and taken to the facility that we had there for them, which I don't think was very far from the airport.
Q And who would pick them up from the airport in Afghanistan?
A I don't know.
Q Would it be MVM employees?
A Yes.
Q It had to be, correct?
A As far as I know, yes.
Q Would you agree that the coordination of the Peruvians, not only the transportation, but the

pickup of the Peruvians, and the assistance of the Peruvians arriving in Afghanistan to wherever their destination was --
MR. ROSENBLUM: Objection. That's speculation. He wasn't in Afghanistan when they arrived so he doesn't know what goes on there.
MR. TSIMPEDES: He might have his own knowledge.
You can answer the question.
And if you can please wait for me to finish my question before you object.
MR. ROSENBLUM: Well, I knew it was speculation so I don't need to wait. I'm that good.
MR. TSIMPEDES: You are speculating with your objection.
BY MR. TSIMPEDES:
Q Do you have knowledge or even if you don't, do you have an understanding of what would happen to the Peruvian guards once they reached Afghanistan?
A I was aware -- I have knowledge of some of the operations on the ground in Afghanistan, but how they got from the airport to the facility, I do not

know.
Q Okay. But MVM would have to communicate with these Peruvians, wouldn't you agree?
A Yes.
Q And to your knowledge, are these Peruvians provided contracts with MVM?
A Yes.
Q And do you know whether that contract is written in English or Spanish?
A I don't remember.
Q And when these Peruvians are provided an MVM contract, are they considered employees of MVM at that time?
A Yes, as far as I know. I believe on this contract, they had to be employees.
Q Did MVM make payments to these Peruvians that were sent from 3D Global to Afghanistan?
A (No audible response)
Q Do you know whether the Federal Government paid MVM on the contract on which 3D Global provided the Peruvian guards?
A I don't know.
Q Would you agree that creating these -- and

I will call them administrative packages, and I think that's what they are referred to in the industry.
A Yes.
Q And tell me if I'm wrong or not.
Would you agree that these administrative packages that were created for the Peruvian guards that were ultimately provided to the Department of State, would you consider that information confidential?
MR. ROSENBLUM: Objection. You are asking him for a legal conclusion, legal opinion.
MR. TSIMPEDES: No, that's not --
MR. ROSENBLUM: You're not asking for facts.
BY MR. TSIMPEDES:
Q You can answer the question.
A Yes, I would, but you know, that's based, I guess, just on my opinion, what kind of personal information will be confidential.
Q Okay. Is there an industry standard?
MR. ROSENBLUM: Objection. He doesn't know.

An industry standard? Come on.
MR. TSIMPEDES: He can testify if he knows an industry standard.
MR. ROSENBLUM: He's talking about confidential as to the individual's information, not the 3D's information.
BY MR. TSIMPEDES:
Q Mr. Turner, do you know whether the administrative packages are considered confidential in the security industry you are involved in?
A I don't know. I don't know, you know, what would be considered confidential. I don't know. I assume that would be a State Department definition.
Q Did MVM consider those administrative packages --
MR. ROSENBLUM: Objection. You are asking --
MR. TSIMPEDES: Mr. Rosenblum, you can object, but no speaking objections are allowed under the court rules.
MR. ROSENBLUM: You know, I will say one thing. You object to my speaking objections, but yet you made a thousand of them with Mr. Dodd and

told him what to say, and told him not to answer. So I don't need to be lectured on the rules.
MR. TSIMPEDES: Well, I think you do, because here, Mr. Rosenblum, I do want to point out you are defending your client's deposition as to the arguments that you would make as objections as well, but we are not here regarding Mr. Dodd. We are here regarding Mr. Turner's --
MR. ROSENBLUM: Mr. Turner is not an expert. He's a fact witness.
Are you saying he's an expert?
BY MR. TSIMPEDES:
Q Mr. Turner, how long have you been involved in the security field?
A Altogether, about two-and-a-half, three years.
Q Okay. And regarding MVM, the administrative packages of -- whether MVM got them from 3D Global or anyone else, do you know whether MVM considered administrative packages confidential?
A I would assume so, in the same manner that they considered my information confidential, because these people are employees of MVM, but I

don't know for sure that somebody labeled them confidential.
Q Okay. That's fair.
Now, do you know what happened to the Peruvians or their administrative packets after Christmas of 2005?
A To the Peruvians coming home?
Q How many Peruvians came home?
A I believe we had around 240 or 250 of them there, and all of them came home.
Q All right. Do you know whether MVM sold or transferred administrative packets to Triple Canopy?
A I believe they were sold to Triple Canopy, yes.
Q Do you know how much compensation MVM received for the transfer of those administrative packets?
A No, I don't.
Q Who would have that information?
A I don't know. I think I recall Rob Rubin being the person to coordinate that, but I don't know for sure.

Q Do you know whether the Peruvians that 3D Global provided that were ultimately provided to Triple Canopy, whether they were shipped back to Afghanistan or anywhere else?

A After they came back to Peru?

Q Correct.

A I don't know for sure if any of them were sent, but I do know that when they landed, Triple Canopy was on the ground there and was waiting for those guys to come in.

Q Do you have any knowledge why Triple Canopy would be waiting for the Peruvians that were sent by 3D Global to return and were on the ground in Peru at that time?

A No. I can guess.

MR. ROSENBLUM: Objection.

THE WITNESS: I can guess that, you know, they knew that these guys were already cleared to some degree with the State Department, so if they had contracts, they knew that, you know, they would be able to pick these guys up and probably get them run through, you know, whatever process they needed to rather quickly, you know, instead of going out

and finding other people to work on their contracts and then screening them, you know, and procuring all the information on these guys, you know, which was quite a timely process.

Q You are talking about the administrative packages, correct?

A Right.

Q How long would it take -- your understanding -- I'm just asking for your understanding -- how long would an administrative package for one guard take?

MR. ROSENBLUM: Objection. It's got to be hearsay and speculation since he wasn't involved in it.

BY MR. TSIMPEDES:

Q You can testify.

A Quite a while, and I think it's too hard to answer because when we were going through the document packets we would often find misinformation and we would have to get that person to get it to us.

Well, that required, you know, us letting Mr. Dodd's employees know that, "Hey, we need to get

some information from this guy, this applicant."

And that guy doesn't have a phone, you know. And they call his uncle who can get a hold of him because he lives down the street, but he's not home, so, you know. Sometimes that would take a couple of hours to get that information we needed and sometimes it would end up taking a couple days.

Q Now, would you agree that administrative packages have value? And I'm saying financial as a financial issue.

MR. ROSENBLUM: Objection. You're asking him to speculate and guess. He doesn't know.

MR. TSIMPEDES: He can testify to whether he knows or not.

THE WITNESS: I don't know what their value would be. I don't know how to define what their value would be, but I guess in the same manner I explained a minute ago, I would assume that they would be valuable simply because I knew these guys were coming back to Lima, and Triple Canopy was very interested in the same guys that we had sent over.

BY MR. TSIMPEDES:

Q So it would be fair to say that Triple

Canopy in your estimation would be looking for these Peruvians who were returning back to be sent to another security detail of some sort?

MR. ROSENBLUM: Objection. He doesn't know what Triple Canopy was going to use them for. They could have been cooks in Peru.

BY MR. TSIMPEDES:

Q You can answer the question, Mr. Turner.

A I would not assume that they would be considered for any other work. I know what Triple Canopy does, I'm familiar with some of the contracts they have, and that would be my assumption.

Q What does Triple Canopy do?

A They do the same type of work that MVM does.

Q They don't hire cooks, do they?

A I don't know.

Q You never heard of them hiring cooks?

A No, sir.

Q Has MVM hired any cooks?

A Not that I'm aware of, sir.

Q While you have been employed with MVM, has Triple Canopy had any contractual relationships with

MVM, to your knowledge?
A Not that I'm aware of.
Q Regarding the Peruvians who returned to Peru in which Triple Canopy was there waiting for them, do you know who at Triple Canopy was involved?
A At the time I knew a name, but I didn't know him personally, but I don't recall the name now.
Q Is it your understanding -- how many contracts have you worked with MVM in which security detail were procured?
A Approximately seven or eight.
Q Do you have an understanding as to when the provider of the security detail, third country nationals, are completed in their work as it relates to -- strike that question.
MR. ROSENBLUM: Counsel, I will object to that question because you are asking him to speculate as to what the terms of a contract were.
MR. TSIMPEDES: I am not.
BY MR. TSIMPEDES:
Q Based on your seven contracts --
MR. ROSENBLUM: They are not his

contracts.
BY MR. TSIMPEDES:
Q You were involved with seven contracts in which security detail were provided to MVM, correct?
A Approximately.
Q So you have knowledge of seven contracts involving MVM.
A Approximately seven security contracts, yes.
Q Now, other than 3D Global, what did you do for these other contracts for MVM to facilitate any security detail going overseas or not?
MR. ROSENBLUM: You are asking what he did personally?
MR. TSIMPEDES: Yes.
THE WITNESS: Most of the contracts I worked on were actually domestic contracts. I do recall working on one contract that was an overseas contract. I played a very small role as far as writing, you know, status reports or anything like that for that contract.
BY MR. TSIMPEDES:
Q What contract was that?

MR. ROSENBLUM: Objection. This is proprietary information. It has nothing to do with this case.
MR. TSIMPEDES: How do you know what he's going to testify to?
MR. ROSENBLUM: Well, he's getting to tell you which contract it is.
MR. TSIMPEDES: I will keep it confidential.
MR. ROSENBLUM: No, that's not going to do it.
MR. TSIMPEDES: You told him, Mr. Rosenblum, to answer every question.
MR. ROSENBLUM: That's proprietary information.
MR. TSIMPEDES: How do you know?
MR. ROSENBLUM: Because he's getting ready to tell you that they did work for X agency or X person. That is proprietary information.
BY MR. TSIMPEDES:
Q Let me ask. Is that --
MR. ROSENBLUM: It's not up to him to determine if it's proprietary.

MR. TSIMPEDES: You have to file the appropriate motion.
MR. ROSENBLUM: All right. Well, I'm telling you --
MR. TSIMPEDES: You never sought --
MR. ROSENBLUM: You are not to answer that question.
BY MR. TSIMPEDES: Knowing that you were going to take the deposition --
MR. ROSENBLUM: I didn't know you were going to ask about other contracts.
MR. TSIMPEDES: Why not?
MR. ROSENBLUM: Well, you can ask him about that contract, but not ask him who it's for. You can ask other things about it, but you are not to ask who --
MR. TSIMPEDES: I want this on the record. You are instructing --
MR. ROSENBLUM: --because, one, it's confidential to my clients, proprietary to my clients, and it also may be a secret that is not to be disclosed according to the United States Government.

MR. TSIMPEDES: To the extent it is, I want you to produce documents to me showing that it is.

MR. ROSENBLUM: I'm not producing them until you give me a motion to produce it.

You can ask him about the contract. You can ask him the information --

MR. TSIMPEDES: It's your burden. And if you're instructing him, we're going to have to come back on your dime, MVM's dime.

MR. ROSENBLUM: That's fine.

MR. TSIMPEDES: And Mr. Turner.

MR. ROSENBLUM: That's fine. Mr. Turner will come back, but he can answer questions about the contract, but he cannot tell you who it's for.

MR. TSIMPEDES: I find that totally ridiculous, especially when you haven't provided any confidentiality or mentioned any confidentiality issues prior to this deposition, but having said that, I do want to go on and we will raise this issue with the court.

BY MR. TSIMPEDES:

Q Without naming the entity, is the entity

involved in any work involving the Peruvians or had any involvement involving the Peruvians at any time?

A No, it was a classified contract.

Q Okay.

A I had very little first-hand knowledge of it.

Q And you said you drafted status reports.

A Yes.

Q Did you draft any status reports or any reports whatsoever, documents, that were provided MVM regarding the Peruvians?

A If I did, they were informal and they were directly to Clyde Slick, but I don't recall in particular, any particular status reports that I drafted for them.

MR. ROSENBLUM: Counsel, you were furnished copies of all e-mails that we have found which number approximately 10,000.

MR. TSIMPEDES: And I am assuming Mr. Slick or Mr. Turner's communications with Mr. Slick would be included in those?

MR. ROSENBLUM: Yes, sir.

MR. TSIMPEDES: Okay.

THE WITNESS: I'm sorry. I probably provided informal, the same type of informal status reports to Peter Rice actually.

MR. TSIMPEDES: And counsel, were those e-mails or reports also provided?

MR. ROSENBLUM: Everything that had to do -- at least everything we found that has to do with correspondence, e-mail or whatever, that involves Mr. Rice, Mr. Turner, Mr. Dodd or anyone else, has been provided.

MR. TSIMPEDES: Okay.

BY MR. TSIMPEDES:

Q Regarding these seven agreements, just generally and then I will ask you specifically -- just generally, did you have an understanding of when the contractual party's duties were completed or fulfilled?

MR. ROSENBLUM: Counsel, I don't think that he said that there was a third party contractor in there, in these other contracts. In fact, he said that there were six that were domestic and one that was international. He did not say that a third party like 3D provided any potential employees.

They may have, but he didn't say that.

BY MR. TSIMPEDES:

Q Did you understand my question?

A Can you repeat it again?

Q I will just change the question. To your knowledge, regarding the export of security detail going overseas, regarding any of MVM's contracts that you are aware of, do you have an understanding as to when that contracting party's duties were fulfilled or completed? In other words, were the duties completed, to your understanding, when they boarded the plane, prior to boarding the plane, when they landed?

What is your understanding of when the contracting party's duties were completed or fulfilled?

A You mean, if we had a third party contract?

Q Yes.

A No, I am not familiar with that in any of the contracts I worked with, with a subcontractor.

Q Okay. What about involving a direct party? Not a third party, but regarding an export of

security detail.

A Well, certainly I knew, you know, on a day-to-day basis when the contract requirements were fulfilled. They were ongoing contracts.

Q When you were in Peru, did you have an understanding as to whether 3D Global had fulfilled its obligations --

MR. ROSENBLUM: Objection.

MR. TSIMPEDES: when -- let me finish my question --

MR. ROSENBLUM: Excuse me.

MR. TSIMPEDES: -- when the Peruvians boarded the plane?

MR. ROSENBLUM: Objection. That's an issue for the court to determine if they had fulfilled their obligation.

MR. TSIMPEDES: You can answer the question.

THE WITNESS: To my knowledge, they fulfilled their obligation when the guys got on the airplane.

BY MR. TSIMPEDES:

Q Do you have an understanding of -- I

believe you testified that you do have an understanding of the ground operations in Afghanistan when the Peruvians landed there.

A I was aware of some of the ground operations there.

Q Could you tell us what happens to the Peruvians once they land?

A You mean, immediately?

Q Well, first immediately and then in general.

MR. ROSENBLUM: Again, he's speculating. It's hearsay because he wasn't there.

MR. TSIMPEDES: Well, he says he had knowledge of the operation.

MR. ROSENBLUM: It would be hearsay.

MR. TSIMPEDES: I don't know about that.

MR. ROSENBLUM: Well, he wasn't there. He can't -- it's hearsay. I'm objecting.

MR. TSIMPEDES: You can object to it, but he can testify.

MR. ROSENBLUM: I understand. I'm objecting because it's hearsay and pure speculation because he wasn't there.

THE WITNESS: I don't know what happened immediately when they landed on the ground. I think that they -- like I said before, I think that they were picked up by MVM and taken to the main camp there, and at some point after that, they started training.

BY MR. TSIMPEDES:

Q What occurs during the training process?

A I'm not very familiar with it, but I think marksmanship, you know, regular, you know, things they need to learn before they stand post.

Q The information you are providing me now, who did you rely on to give you that information from MVM, if anybody?

A As far as what happened on the ground? MVM employees.

Q Which MVM employees?

MR. ROSENBLUM: Continuing objection.

THE WITNESS: I had some communications with Tim Lynch, project manager, and some with another MVM employee, Robert Thacker, who was not there all the time, the entire time that the Peruvians were on the ground there, but I know he

made one or two trips during that time.

BY MR. TSIMPEDES:

Q So would it be fair to say that while the Peruvians were present in Afghanistan, that Tim and or Robert Thacker had contact with you and you spoke about the ground operations?

A Yes.

Q At any time during those discussions, did Tim Lynch or Robert Thacker tell you that the Peruvians did not meet the English level requirement?

A No, not that I recall.

Q To your knowledge, did the State Department determine that the Peruvians did not meet the English level requirement of the contract?

A To my knowledge, no.

Is that what you are asking?

Q Yes.

A Can you repeat it, please?

Q Sure. To your knowledge, did the Department of State make a determination that the Peruvians did not meet the English level requirement of the contract, and did so in writing?

A No, but that's what I understood from Rob Rubin, you know, told me when I was on the ground in Peru.
Q That happened when?
A That was -- actually I believe that was Christmas Eve or -- well, I'm sorry. It was a couple days before Christmas.
Q But to your knowledge, you have not seen any document from the State Department indicating that the Peruvians provided by 3D Global did not meet the English level requirement?
A No, I did not ever see any document.
MR. TSIMPEDES: No further questions.
MR. ROSENBLUM: I just have a few.
FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANT
BY MR. ROSENBLUM:
Q Mr. Turner, you said that an MVM employee came down to act as a courier one time, is that correct?
A Yes.
Q Other than that MVM employee and maybe another one or two may have passed through Peru, were you the only MVM employee in Peru for a

substantial period of time?
A For a substantial period of time, yes.
Q Okay.
A In fact, there were only three of us altogether that were ever down there.
Q Okay. You and the other courier, and who was the other one?
A He was in HR, Joe -- I forgot his last name. He came down there when we actually had a Peruvian commit suicide in Afghanistan.
Q Okay. So that was after everybody had gotten to Kabul?
A I don't remember if that was after everybody got there. It was at least after the first few pax lifts we had go over there.
Q And his job was to deal with the family, is that what he did?
A Yes, which -- well, I dealt with the family initially, and then probably about a week later Joe came down, and Joe -- he's a native speaker. He ended up coming down to help out with, you know, making funeral arrangements and stuff.
Q Do you remember participating either in

person or by phone in conference calls on Monday the 12th of December, Wednesday the 14th of December, and Monday the 19th of December, where the issues of the English fluency of the guards was discussed?
A Conference calls with?
Q With Mark Hamilton, Joe Morway, Jay Kreider, Sarah Meagher, Maria Campos, Peter Rice, Dave Hofmann, Alper Yargici --
MR. TSIMPEDES: Objection.
BY MR. ROSENBLUM:
Q -- Jaysen Turner, Mark Hamilton, Craig Schwartz, Linda Burnell and Rob Rubin.
A Can you tell me the dates again?
Q December 12, December 14 and December 19.
A I don't recall. I don't specifically recall those conference calls and I didn't think that it would be that early that those issues came up.
When I knew it was an issue to the point where we might end up losing the contract was when Rob Rubin called, and I think it was 23 December.
Q But you could be mistaken?
A Well, no. The call with Rob Rubin I

recall very well.
Q But you could be mistaken when you first learned that there was a problem with the English?
A Well, it was sometime in the middle to later December, because that's when I started coordinating, you know, we need to get these guys -- these guys that were going to continue to screen and stuff, we need to get them to call the company in Atlanta.
Q So the middle to the end, the middle toward Christmas, middle toward Christmas would be the 12, 13, 14, 15, 16, in that time frame, right?
MR. TSIMPEDES: Objection. He's testified as to what he remembers.
BY MR. ROSENBLUM:
Q Is that correct?
A No, I would have thought it would have been closer to the time when I had the call with Rob Rubin on the 23rd, because when that issue came up, it seemed to all happen very quickly to me.
I learned that it was an issue or a potential issue, and then very quickly after that, Rob -- and that's when I started, you know,

coordinating, hey, how are we going to get these guys to take the test over the phone?

And then very quickly after that -- I hadn't even had time to screen any of them -- very quickly after that, Rob Rubin called me and said, "Stop what you're doing."

Q But you knew before the State Department declared the contract --

MR. TSIMPEDES: Objection. That's a total misrepresentation of the facts. He testified he has no idea what the State Department has done, and to his knowledge, they haven't done anything.

BY MR. ROSENBLUM:

Q You knew, Mr. Turner, before you were advised by Mr. Rubin, that the State Department had sent a default notice Christmas Eve or the day before Christmas Eve, that there was an issue about the fluency, the English fluency?

MR. TSIMPEDES: Objection. There's no evidence provided that the State Department made any determination, nor has his testimony indicated --

MR. ROSENBLUM: There will be. We will get to that.

MR. TSIMPEDES: Sure, but he hasn't said that.

THE WITNESS: I am not aware of when the letters came from the State Department or what they said because I never saw any.

BY MR. ROSENBLUM:

Q Right, but before that conversation, with Mr. Rubin, you were aware that there was an issue about English fluency.

MR. TSIMPEDES: Objection.

THE WITNESS: Yes, I was aware because -- and that's why I ended up starting to coordinate taking this language test and why MVM procured the help of the company out of Atlanta.

BY MR. ROSENBLUM:

Q Okay. And this was in mid-December?

A Mid to late December, yes, as I recall.

Q Of 2005?

A Right. Yes.

MR. ROSENBLUM: I don't have anything else.

You have the right to read the deposition and make any corrections that our court reporter

made with respect to errors he made in transcribing it. You are not allowed to change your testimony. Or you may allow Mr. McCoy --

MR. TSIMPEDES: You can waive your signature and the right to read the transcript, if you so choose.

THE WITNESS: I don't think I need to read it.

(Thereupon, at 12:30 p.m., the taking of the deposition was concluded)

(The witness waived reading and signature of the deposition)

CERTIFICATE OF NOTARY PUBLIC

I, RONALD E. JOHNSON, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in machine shorthand and reduced to computerized transcription under my direction and supervision; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

________________________

Ronald E. Johnson, Notary Public
for the Commonwealth of Virginia
Commission No. 133607

MY COMMISSION EXPIRES: November 30, 2010

<Dates>.
23 december. 75:21.
4-18-78. 6:16.
August 15th 7:19.
December 12, december 14 75:14.
December 19. 75:14.
January, december 38:12.
January. 8:1, 38:6.
November 30, 2010 80:21.
November. 18:10, 31:17.
October 18, 2007 1:13.
two may 73:22.
'04 8:15, 9:7.
'04. 8:14.
'05 8:9, 9:8, 9:19, 11:13, 38:12.
'05. 10:11, 11:12.
'06 8:2, 38:13.
'06. 8:10.
-because 64:19.
-and- 2:22.
-vs- 1:8.

<0>.
06cv00722(gk 1:7.

<1>.
1 1:7.
10,000. 66:18.
100 12:3, 25:10, 25:19, 29:22.
100. 21:8, 21:13, 26:6.
10:30 1:20.
1197 3:3.
12 76:12.
12:30 79:9.
12th 75:2.
13 76:12.
133607 80:20.
14 76:12.
14th 75:2.
15 76:12.
16 76:12.
19th 75:3.

<2>.
2 40:2.
20 12:4, 13:11, 14:20, 15:2.
20. 13:12.
20005 2:11.
2004. 8:12.
2005 48:12, 48:20, 56:6, 78:18.
201420 2:9.
202-638-2100 2:12.
211 2:18.
22102 3:4.
22206. 6:14.
22313 2:20.
23 31:16.
23rd 34:10, 76:19.
24 31:16.
240 56:9.
24th 34:10.
250 56:9.
2534 6:13.

<3>.
3 40:2.
30 14:21, 15:2, 15:16, 23:18.
3D 1:4, 28:14, 35:4, 35:11, 39:15, 44:13, 44:19, 45:8, 45:19, 46:17, 47:3, 47:11, 52:17, 52:20, 54:6, 55:19, 57:1, 57:13, 62:10, 67:23, 69:6, 73:10.

<4>.
4 40:2.
40 15:16, 23:18, 32:4, 34:9.
41 4:12.
45 32:5.

<5>.
5 4:10.
50 12:2.
58 2:19.

<6>.
6526 2:18.
6:30 14:2.

<7>.
70 21:8, 21:13, 25:10, 25:19, 26:6, 29:22.
703-684-0060 2:21.
703-893-8175 3:5.
73 4:10.

<A>.
a.m 1:20.
abilities 35:20, 41:15.
ability 35:7, 37:13, 38:2, 38:9.
able 57:21.
accepted 36:8, 36:9.
according 64:22.
accumulating 17:7, 17:9.
accurately 29:19.
Across 24:1, 24:3, 29:5.
act 73:18.
acted 30:2.
acting 30:15, 30:19.
action 80:12, 80:16.
Actually 5:11, 6:23, 7:3, 8:8, 9:1, 9:23, 10:14, 11:2, 11:6, 13:14, 15:4, 15:10, 19:21, 28:5, 30:12, 30:21, 36:12, 47:17, 48:13, 48:15, 62:17, 67:3, 73:5, 74:9.
Adam 12:14, 12:16, 12:17, 12:18, 12:21, 14:3, 14:12, 14:14, 17:1, 17:4, 17:14.
additional 22:21, 30:8.
address 6:12.
adequate 46:14.
adequately 49:6.
administrative 53:1, 53:6, 54:9, 54:14, 55:18, 55:20, 56:5, 56:12, 56:17, 58:5, 58:10, 59:8.
advised 77:15.
Afghanistan 10:2, 31:14, 39:1, 49:4, 50:10, 50:16, 51:2, 51:5, 51:20, 51:22, 52:17, 57:4, 70:3, 72:4, 74:10.
afternoon 12:23,

15:20, 35:22.
agency 63:18.
ago 6:8, 59:18.
agree 44:3, 47:2, 50:22, 52:3, 52:23, 53:6, 59:8.
agreement 45:9.
agreements 67:13.
airplane 69:21.
airport 14:7, 14:12, 33:14, 33:15, 36:15, 50:7, 50:12, 50:14, 50:16, 51:23.
Alexandria 2:20.
allow 79:3.
allowed 54:19, 79:2.
alone 19:1.
Alper 75:8.
already 13:20, 38:5, 48:10, 57:18.
although 47:2.
Altogether 55:15, 74:5.
American 28:12.
amount 7:11, 30:1, 32:6.
analyst 8:18, 8:19, 8:21.
answer 5:15, 25:21, 25:23, 26:3, 26:4, 37:8, 45:13, 51:9, 53:17, 55:1, 58:18, 60:8, 63:13, 64:6, 65:14, 69:17.
answered 5:17.
answers 5:20.
anybody 71:14.
APPEARANCES 2:4.
appears 80:4.
applicant. 59:1.
applicants 17:14, 35:16, 44:23, 45:1.
application 17:20, 22:18, 30:17, 36:8.
applications 13:11, 14:21, 15:18, 18:2, 19:19, 20:6, 21:2, 21:15, 22:21, 23:13, 25:10, 25:19, 27:12, 29:4, 30:8.
approach 38:8.
appropriate 30:16, 41:16, 64:2.
appropriately 22:6.
approximate 21:10.
Approximately 8:9, 11:11, 12:2, 12:3, 12:4, 13:10, 14:1, 14:4, 18:4, 18:16, 21:5, 21:8, 21:13, 22:15, 24:7, 25:10, 26:9, 26:19, 29:15, 29:23, 31:22, 32:19, 34:8, 34:13, 34:16, 61:12, 62:5, 62:8, 66:18.
approximation 11:23, 21:11.
area 20:11, 28:19.
areas 15:13, 23:21.
arguments 55:6.
Arlington 6:14.
around 17:12, 36:17, 37:2, 44:20, 56:9.
arrangements 74:22.
arrived 13:23, 15:19, 51:6.
arriving 51:2.
articulate 5:19.
assist 22:11, 33:9, 50:5.
assistance 51:1.
assistant 10:13.
assistants 27:13, 27:16, 47:4, 47:8, 47:9.
assisted 47:2, 47:3, 49:3.
assisting 32:15.
assume 5:15, 13:17, 21:21, 26:21, 54:13, 55:21, 59:18, 60:9.
assuming 66:19.
assumption 60:12.
ATHAN 2:8.
Atlanta 38:16, 40:7, 76:9, 78:14.
attached 30:17.
attachments 16:4, 21:22, 30:17.
attention 45:6.
attorney 80:14.
audible 52:18.
Avenue 2:9.
aware 24:4, 34:5, 37:15, 37:16, 45:21, 46:8, 51:21, 60:21, 61:2, 68:8, 70:4, 78:3, 78:8, 78:11.
away 23:17, 24:7.

<B>.
bag 13:16.
bags 15:22.
Based 53:18, 61:22.
basically 16:10, 20:16, 23:13.
basing 13:13.
basis 22:15, 24:21, 69:3.
beat 26:2.
became 37:16.
beer 40:19.
begin 8:6.
beginning 18:22.
behalf 1:22.
believe 12:14, 12:16, 16:21, 17:22, 17:23, 18:22, 19:7, 20:13, 26:5, 26:6, 35:2, 38:17, 42:15, 47:3, 49:23, 50:11, 52:14, 56:9, 56:14, 70:1, 73:5.
best 6:2, 31:12.
big 13:13.
bills 36:14.
birth 6:15.
bit 6:21, 15:23, 23:9, 30:1, 31:8, 33:14, 40:17.
boarded 68:12, 69:13.
boarding 68:12.
Box 2:19.
break 40:23.
brief 41:5.
bring 11:3, 23:5, 46:12, 47:22.
bringing 30:20.
brought 18:2, 22:21, 23:16, 30:5, 46:14, 46:15, 47:10.
bunch 7:2, 23:8.
burden 65:8.
Burrell 75:12.
buses 33:14.

<C>.
C-O-N-T-E-N-T-S 4:1.
call 53:1, 59:3, 75:23, 76:8, 76:18.

called 1:18, 5:4, 8:17, 43:14, 75:21, 77:5.
calling 39:1.
calls 75:1, 75:5, 75:16.
camp 71:4.
Campos 75:7.
Canopy 56:13, 56:14, 57:3, 57:9, 57:12, 59:20, 60:1, 60:5, 60:11, 60:13, 60:23, 61:4, 61:5.
capabilities 39:12.
capability 39:21, 40:11.
carry-on 15:21.
carrying 13:15.
CASE 1:7, 63:3.
cash 36:14, 36:23.
center 29:4.
certainly 39:13, 69:2.
CERTIFICATE 80:1.
certify 80:4.
change 68:5, 79:2.
changed 30:11.
changing 9:13.
check 37:3, 39:12.
choose 79:6.
Christmas 48:14, 48:20, 56:6, 73:6, 73:7, 76:11, 77:16, 77:17.
classified 7:5, 66:3.
classrooms 13:8.
cleared 57:18.
client 55:5.
clients 7:7, 64:20, 64:21.
closer 76:18.
Clyde 10:3, 10:7, 10:13, 31:8, 66:13.
CMR 1:21.
collate 21:15, 21:18, 30:8.
collated 21:1.
Collating 15:5, 20:6, 24:18, 44:21.
COLUMBIA 1:2.
coming 10:4, 24:13, 25:1, 56:7, 59:20, 74:21.
commencing 1:20.
COMMISSION 80:20, 80:21.
commit 74:10.
Commonwealth 1:21, 80:19.
communicate 52:2.
communications 66:20, 71:19.
company 7:1, 38:16, 40:7, 76:8, 78:14.
compensation 56:16.
competency 48:21.
complete 13:18.
completed 13:20, 15:3, 15:19, 20:20, 22:4, 61:15, 67:16, 68:10, 68:11, 68:15.
completing 17:15.
complying 45:8.
computerized 80:7.
concern 46:5, 48:7, 48:11.
concerns 45:16, 45:18, 46:8, 46:9.
concluded 79:10.
conclusion 53:12.
Conference 28:22, 75:1, 75:5, 75:16.
confidential 53:10, 53:20, 54:5, 54:9, 54:12, 55:20, 55:22, 56:2, 63:9, 64:20.
confidentiality 65:18.
consecutive 49:19.
consider 49:16, 53:9, 54:14.
considered 52:12, 54:9, 54:12, 55:20, 55:22, 60:10.
contact 43:23, 72:5.
continue 30:9, 76:7.
continued 47:8.
Continuing 15:11, 71:18.
contract 9:23, 10:1, 10:5, 34:22, 34:23, 35:4, 35:9, 35:11, 44:14, 52:8, 52:12, 52:15, 52:20, 61:19, 62:18, 62:19, 62:21, 62:23, 63:7, 64:14, 65:6, 65:15, 66:3, 68:18, 69:3, 72:15, 72:23, 75:20, 77:8.
contracting 68:9, 68:15.
contractor 7:20, 67:19.
contracts 7:4, 7:6, 9:2, 9:3, 52:6, 57:20, 58:1, 60:11, 61:10, 61:22, 62:1, 62:3, 62:6, 62:8, 62:11, 62:16, 62:17, 64:11, 67:20, 68:7, 68:21, 69:4.
contractual 60:23, 67:16.
conversation 5:11, 7:10, 43:10, 78:7.
conversations 42:16, 42:18, 42:22, 43:17.
cooks 60:6, 60:16, 60:18, 60:20.
coordinate 36:13, 42:11, 43:16, 48:4, 56:22, 78:12.
coordinating 9:2, 33:11, 33:12, 38:16, 39:2, 40:6, 41:12, 47:23, 48:2, 76:6, 77:1.
coordination 50:22.
copies 66:17.
Corona 40:20.
corrections 78:23.
correctly 42:13.
correspondence 67:8.
COUNSEL 1:18, 5:7, 41:7, 61:17, 66:16, 67:4, 67:18, 73:15, 80:11, 80:14.
country 61:14.
couple 59:5, 59:7, 73:7.
courier 16:11, 16:15,

16:18, 29:10, 29:15, 30:3, 30:19, 73:18, 74:6.
course 5:10.
COURT 1:1, 4:21, 5:22, 54:20, 65:21, 69:15, 78:23.
Craig 75:11.
created 53:7.
creating 7:2, 52:23.
Cuba 40:16.

<D>.
daily 22:15.
date 6:15, 31:15, 31:19, 43:14, 43:16.
dates 10:22, 75:13.
Dave 75:8.
day 11:7, 12:12, 20:20, 32:20, 34:15, 47:20, 49:19, 77:16.
day-to-day 69:3.
days 11:9, 49:19, 59:7, 73:7.
DC 2:11.
DEA 9:4.
deal 10:6, 74:16.
dealt 74:18.
Deborah 28:8, 28:11.
December 37:20, 38:12, 48:13, 75:2, 75:3, 76:5, 78:17.
declared 77:8.
default 77:16.
DEFENDANT 1:10, 1:18, 2:15, 5:7, 73:15.
defending 55:5.
Defense 6:20, 6:22.
define 21:17, 59:16.
definition 54:13.
degree 57:19.
Department 11:18, 25:11, 35:1, 35:12, 53:8, 54:13, 57:19, 72:14, 72:21, 73:9, 77:7, 77:11, 77:15, 77:20, 78:4.
Deposition 1:15, 4:22, 5:12, 23:20, 42:10, 43:21, 44:1, 55:5, 64:9, 65:19, 78:22, 79:10, 79:12, 80:3, 80:5, 80:9, 80:12.
describe 13:5, 44:17.
described 23:11.
destination 51:3.
detail 60:3, 61:11, 61:14, 62:4, 62:12, 68:6, 69:1.
determination 39:18, 72:21, 77:21.
determine 39:7, 39:14, 39:15, 45:11, 63:23, 69:15, 72:14.
different 21:10, 27:6.
dime 65:10.
direct 68:22.
direction 31:7, 80:8.
directions 31:9.
directly 66:13.
director 9:2, 9:11.
disclosed 64:22.
discrepancy 42:8, 42:12.
discuss 43:18.
discussed 75:4.
discussions 72:8.
DISTRICT 1:1, 1:2.
document 58:19, 73:9, 73:12.
documents 11:3, 12:23, 13:1, 13:2, 13:6, 15:12, 15:23, 20:21, 24:17, 24:18, 35:17, 44:21, 45:15, 46:11, 46:13, 46:16, 47:10, 65:2, 66:10.
Dodd 12:8, 19:8, 19:10, 19:20, 21:1, 22:9, 23:20, 27:8, 28:19, 32:14, 45:16, 46:4, 47:2, 47:4, 54:23, 55:7, 58:23, 67:9.
doing 24:17, 40:12, 44:11, 44:12.
doing. 77:6.
domestic 62:17, 67:21.
done 45:19, 77:11, 77:12.
door 33:19.
down 5:22, 11:1, 11:2, 12:8, 27:3, 27:7, 32:14, 32:15, 44:4, 44:5, 44:7, 45:4, 45:23, 46:6, 47:1, 47:7, 47:18, 47:19, 47:20, 47:21, 47:23, 48:8, 48:10, 59:4, 73:18, 74:5, 74:9, 74:20, 74:21.
draft 66:9.
drafted 66:7, 66:15.
Drive 6:13.
duly 5:4, 80:5.
During 4:22, 20:23, 26:10, 26:11, 27:5, 38:7, 71:8, 72:1, 72:8.
duties 10:10, 32:12, 39:17, 67:16, 68:9, 68:11, 68:15.

<E>.
e-mail 67:8.
e-mails 66:17, 67:5.
E-X-H-I-B-I-T-S 4:16.
E. 1:20, 80:2, 80:18.
Early 11:6, 15:20, 18:9, 18:11, 75:17.
Eight 22:16, 23:5, 23:6.
eight. 61:12.
either 38:11, 49:22, 74:23.
employed 6:17, 6:19, 60:22, 80:11, 80:14.
employee 47:19, 71:21, 73:17, 73:21, 73:23, 80:14.
employees 28:14, 38:13, 44:19, 47:20, 50:18, 52:12, 52:15, 55:23, 58:23, 67:23, 71:16, 71:17.
employment 7:19, 8:6, 8:8, 9:16, 26:11.
end 11:11, 11:13, 29:14, 48:13, 59:7, 75:20, 76:10.

ended 74:21, 78:12.
English 17:16, 17:21, 35:7, 35:20, 37:14, 38:2, 38:9, 39:9, 39:12, 39:16, 40:2, 41:11, 41:14, 41:15, 41:18, 42:19, 43:1, 45:2, 48:7, 48:21, 49:7, 52:9, 72:10, 72:15, 72:22, 73:11, 75:4, 76:3, 77:18, 78:9.
entail 8:23.
entailed 9:1.
entering 43:3.
entire 11:7, 71:22.
entity 65:23.
environment 28:18.
errors 79:1.
especially 65:17.
ESQ 2:8, 2:17, 3:1.
estimate 29:18, 34:8, 34:9.
estimation 60:1.
Eve 73:6, 77:16, 77:17.
evening 14:1.
everybody 74:11, 74:14.
Everything 30:11, 34:1, 67:6, 67:7.
evidence 77:20.
exact 31:19.
exactly 8:23, 16:17, 17:12, 35:13, 37:20, 50:4.
EXAMINATION 1:18, 4:8, 5:7, 41:7, 73:15.
examined 5:5.
Excuse 69:11.
executive 20:11, 28:23.
EXHIBIT 4:19.
exhibits 4:21.
exit 36:15, 36:22.
expert 40:3, 55:10, 55:11.
EXPIRES 80:21.
explained 23:11, 59:18.
export 68:6, 68:23.
extent 65:1.
<F>.
face 36:9.
facilitate 33:9, 36:22, 62:11.
facility 12:21, 13:5, 13:8, 14:9, 14:15, 23:10, 24:2, 24:6, 24:16, 36:5, 36:17, 37:5, 37:6, 44:4, 44:6, 44:9, 44:12, 50:12, 51:23.
fact 48:23, 50:3, 55:10, 67:20, 74:4.
facts 53:15, 77:10.
fair 11:4, 14:20, 21:1, 36:5, 36:7, 49:2, 56:3, 59:23, 72:3.
familiar 60:11, 68:20, 71:9.
family 74:16, 74:19.
far 15:23, 17:6, 21:11, 25:8, 46:18, 50:13, 50:21, 52:14, 62:19, 71:15.
fashion 42:13, 50:1.
Federal 52:19.
feel 42:13, 46:13.
fees 36:15.
feet 15:16.
female 27:22.
few 15:3, 29:20, 36:13, 41:19, 73:14, 74:15.
field 55:14.
figure 40:8.
file 64:1.
fill 15:12.
filled 22:6.
filling 12:22.
financial 59:9, 59:10.
financially 80:15.
find 41:15, 45:7, 58:19, 65:16.
finding 58:1.
Fine 21:12, 25:3, 25:15, 65:11, 65:13.
finish 37:8, 51:11, 69:9.
finished 22:17, 23:4.
firm 13:7.
first 5:4, 8:13, 11:1, 12:5, 12:7, 16:23, 18:17, 31:16, 32:2, 32:4, 34:8, 34:15, 37:2, 44:5, 44:7, 45:20, 47:6, 47:21, 48:4, 49:11, 49:17, 70:9, 74:15, 76:2.
first-hand 24:23, 66:5.
five 23:21, 23:23, 24:1.
five-minute 40:22.
flew 11:6, 11:8, 13:3, 13:23, 14:5.
flights 26:22.
Floor 2:10.
flow 23:7.
flown 48:5.
fluency 39:9, 48:7, 75:4, 77:18, 78:9.
fluent 39:16, 40:13, 40:15.
fly 32:7.
folders 15:17.
follows 5:6.
force 10:2.
foregoing 80:3, 80:5.
forgot 8:16, 74:8.
forgotten 12:12.
forms 21:21.
forth 26:22.
forward 35:17.
forwarded 11:17.
found 66:17, 67:7.
four 7:1, 11:1, 14:11, 27:6.
fourth 27:15, 30:7.
frame 18:8, 76:12.
Front 6:20, 6:21, 7:18, 33:19.
fulfilled 67:17, 68:10, 68:16, 69:4, 69:6, 69:15, 69:20.
full 29:20.
function 30:10, 31:2.
funeral 74:22.
furnished 66:17.
<G>.
Gaba 3:2.
general 70:10.
generally 67:14,
85

67:15.
getting 15:10, 30:11, 30:21, 36:14, 63:6, 63:17.
give 6:2, 7:7, 11:22, 31:6, 65:5, 71:13.
given 11:17, 31:4, 39:4, 80:10.
Global 1:4, 45:19, 47:3, 47:11, 52:17, 52:20, 55:19, 57:2, 57:13, 62:10, 69:6, 73:10.
gotten 74:12.
Government 52:19, 64:23.
ground 32:9, 51:22, 57:9, 57:13, 70:2, 70:4, 71:2, 71:15, 71:23, 72:6, 73:2.
group 23:1, 34:8, 34:14, 34:15, 34:19, 34:20, 50:2.
groups 48:4, 49:17, 49:18, 49:20, 50:1.
Guard 35:8, 39:17, 58:11.
guards 37:13, 38:3, 38:8, 38:18, 38:23, 39:3, 39:5, 39:8, 39:9, 41:10, 44:14, 48:5, 48:8, 48:21, 49:3, 49:6, 51:19, 52:21, 53:7, 75:4.
guess 18:9, 21:7, 21:9, 21:11, 23:23, 28:6, 44:20, 46:4, 53:19, 57:15, 57:17, 59:12, 59:17.
guests 20:15.
guy 12:11, 59:1, 59:2.
guys 33:13, 33:22, 49:17, 57:10, 57:18, 57:21, 58:3, 59:19, 59:21, 69:20, 76:6, 76:7, 77:2.
<H>.
Hamilton 75:6, 75:11.
handful 44:19.
handle 39:17.
handled 24:16.
hands-on 38:8.
happen 39:2, 51:19, 76:20.
happened 6:1, 56:4, 71:1, 71:15, 73:4.
happens 70:6.
hard 58:17.
head 5:21, 5:23.
heading 41:16.
hear 35:19, 41:10, 41:13.
heard 41:18, 60:18.
hearsay 58:13, 70:12, 70:15, 70:18, 70:22.
help 30:8, 36:23, 37:8, 46:1, 46:6, 46:7, 46:9, 74:21, 78:14.
helped 15:22, 32:11, 46:11.
helping 37:9, 48:3, 48:4.
Herbert 2:17, 5:10.
hereby 80:3.
hereto 80:15.
hire 60:16.
hired 7:3, 10:3, 60:20.
hiring 60:18.
Hofmann 75:8.
hold 59:3.
home 16:7, 56:7, 56:8, 56:10, 59:4.
hotel 14:10, 24:23, 28:17, 28:18, 29:7.
hotels 27:6.
hour 20:20, 23:16, 24:7, 36:18.
hours 14:11, 22:16, 59:6.
HR 74:8.
huge 13:16.
huh-uh 5:21.
Hunt 3:3.
<I>.
I-S-A-U-R-A 27:21.
idea 77:11.
IDENT 4:19.
immediately 70:8, 70:9, 71:2.
implement 38:15.
in-country 13:7.
in. 14:5, 28:20, 43:8, 49:15, 57:10.
Inc. 1:4, 1:9, 1:19.
included 66:21.
independent 7:20.
indicate 45:8.
indicated 77:21.
indicating 73:9.
individual 54:5.
individuals 12:22.
industry 53:3, 53:21, 54:1, 54:3, 54:10.
informal 66:12, 67:2.
information 17:8, 17:10, 22:5, 24:5, 24:15, 53:9, 53:20, 54:5, 54:6, 55:22, 56:20, 58:3, 59:1, 59:6, 63:2, 63:15, 63:19, 65:7, 71:12, 71:13.
informed 48:19.
initial 24:17, 49:20.
initially 24:6, 74:19.
inquire 17:1, 17:4.
instead 30:11, 30:14, 57:23.
instructing 64:18, 65:9.
instruction 31:6.
integrator 7:9.
interested 10:4, 10:6, 10:7, 59:21, 80:16.
international 67:22.
internationally 33:23.
interrupt 42:10.
interview 39:8, 41:20.
interviewing 23:22, 40:10.
interviews 39:11.
involved 49:15, 54:10, 55:14, 58:13, 61:5, 62:3, 66:1.
involvement 66:2.
involves 67:9.
involving 62:7, 66:1,
86

66:2, 68:22.
Isaura 27:19, 28:9.
issue 37:21, 37:22, 39:8, 39:23, 42:21, 48:20, 59:10, 65:21, 69:14, 75:19, 76:19, 76:21, 76:22, 77:17, 78:8.
issues 65:19, 75:3, 75:17.
itself 34:23.
<J>.
Jack 8:16.
January 8:2, 8:9, 38:12, 48:12.
Jay 75:6.
Jaysen 1:16, 4:4, 5:3, 75:11.
job 7:14, 8:15, 9:12, 31:1, 31:4, 49:7, 74:16.
Joe 74:8, 74:20, 75:6.
John 12:13.
Johnson 1:20, 2:2, 80:2, 80:18.
July 9:8.
June 9:8.
<K>.
Kabul 10:2, 30:22, 31:13, 33:10, 74:12.
keep 63:8.
Kind 7:6, 7:7, 7:8, 9:1, 9:6, 9:12, 46:5, 53:19.
King 2:18.
Knowing 6:6, 64:8.
knowledge 13:13, 24:23, 48:6, 51:8, 51:17, 51:21, 52:5, 57:11, 61:1, 62:6, 66:5, 68:6, 69:19, 70:14, 72:13, 72:16, 72:20, 73:8, 77:12.
knows 54:2, 59:14.
Kreider 75:7.
<L>.
L 3:1.
label 40:1.
labeled 56:1.
land 70:7.
landed 57:8, 68:13, 70:3, 71:2.
language 35:7, 39:21, 39:23, 40:11, 42:21, 48:11, 78:13.
large 22:1.
last 7:20, 12:19, 28:1, 28:3, 28:8, 49:8, 74:8.
late 78:17.
later 36:13, 37:18, 74:20, 76:5.
Leading 25:13.
learn 71:11.
learned 37:12, 37:22, 48:11, 48:14, 76:3, 76:21.
least 40:5, 67:7, 74:12, 74:14.
leave 9:10.
lectured 55:2.
left 8:10, 9:8, 9:11, 47:8.
legal 53:12.
less 30:1.
letters 78:4.
letting 58:22.
Level 40:1, 40:2, 72:10, 72:15, 72:22, 73:11.
lift 31:16, 32:6, 32:19.
lifts 74:15.
Lima 11:6, 23:12, 24:1, 24:3, 31:13, 59:20.
Linda 75:12.
Line 6:20, 6:22, 7:18.
list 48:1.
little 5:11, 6:21, 15:23, 23:9, 26:12, 30:1, 66:5.
lives 59:4.
location 36:12.
locations 23:21, 24:1, 24:2.
long 6:8, 7:17, 9:6, 16:20, 19:5, 21:14, 22:14, 26:8, 26:10, 55:13, 58:8, 58:10.
looked 17:12, 37:2.
looking 9:16, 60:1.
Lopez 21:23.
losing 75:20.
lost 40:17.
lounge 20:11, 28:23.
luggage 13:14.
Lynch 71:20, 72:9.
<M>.
M-A-R-C-A 28:6.
machine 80:7.
main 71:4.
Major 32:21.
manager 71:20.
manifest 32:18, 32:20.
manifests 33:12.
manner 55:21, 59:17.
Marca 28:5.
Maria 75:7.
Mark 75:6, 75:11.
marked 4:21.
marketing 7:3.
marksmanship 35:16, 71:10.
Marriott 19:11, 19:13, 19:16, 22:12, 22:22, 24:8, 24:19, 27:4, 29:1, 29:6.
marshall 9:4.
MASKELL 3:1, 3:2, 4:11, 8:18.
materials 7:3.
matter 11:1, 27:2, 43:18, 43:21, 48:23.
Mccoy 79:3.
Mclean 3:4.
Meagher 75:7.
mean 21:17, 23:23, 46:16, 47:15, 68:17, 70:8.
meant 43:7.
meet 12:8, 19:8, 72:10, 72:14, 72:22, 73:11.
memory 6:9.
mentioned 7:10, 47:4, 65:18.
met 5:10, 14:3.
Mid 78:17.
mid-day 14:13.
mid-december 78:16.
Mid-november 26:20.
middle 76:4, 76:10, 76:11.
87

Mike 12:8, 12:11, 32:14, 46:6, 46:9.
military 7:5, 9:5.
mind 31:15.
minute 59:18.
minutes 23:18.
misinformation 58:19.
misrepresentation 77:10.
mistaken 75:22, 76:2.
Monday 75:1, 75:3.
monitor 45:5.
months 7:21, 8:10, 9:9.
morning 5:9, 6:9, 11:7, 14:1, 14:2.
Morway 75:6.
mostly 7:5.
mother 26:2.
motion 64:2, 65:5.
mouth 42:5.
move 9:17.
moved 9:12.
movement 33:10.
MS. 4:11, 8:18.
<N>.
name 5:9, 12:12, 12:14, 12:16, 12:18, 12:19, 28:2, 28:3, 28:8, 61:6, 61:7, 74:9.
names 27:18, 27:19.
naming 65:23.
nationals 61:15.
native 74:20.
need 5:20, 51:13, 55:2, 58:23, 71:11, 76:6, 76:8, 79:7.
needed 10:13, 11:17, 57:22, 59:6.
neither 19:21, 80:10.
New 2:9.
next 31:1, 34:14, 34:19, 34:20.
niche 7:6.
night 11:8, 13:3.
nine 7:21, 23:5, 23:6.
nod 5:21.
nods 5:22.
none 33:18.
nor 77:21, 80:11, 80:15.
Notary 1:21, 5:5, 80:1, 80:18.
nothing 6:6, 6:7, 45:14, 63:2.
notice 1:19, 77:16.
noticed 45:14.
November 18:11, 18:19, 18:22, 18:23, 19:2, 29:15, 34:10.
number 21:2, 34:17, 66:18.
NW 2:9.
<O>.
O. 2:19.
object 21:16, 51:11, 54:19, 54:22, 61:17, 70:19.
objecting 25:4, 70:18, 70:22.
Objection 24:10, 24:20, 25:13, 25:20, 33:6, 34:4, 36:19, 38:20, 45:10, 46:15, 51:4, 51:15, 53:11, 53:22, 54:16, 57:16, 58:12, 59:11, 60:4, 63:1, 69:8, 69:14, 71:18, 75:9, 76:13, 77:9, 77:19, 78:10.
objections 54:19, 54:22, 55:6.
obligation 69:16, 69:20.
obligations 69:7.
obviously 44:13.
occur 43:6.
occurs 71:8.
October 8:9, 9:18, 10:11, 11:12, 11:13.
office 10:15, 43:20.
officer 80:2.
offices 1:19, 13:9.
often 58:19.
once 43:15, 51:19, 70:7.
One 8:9, 9:5, 18:5, 18:16, 20:22, 27:1, 27:15, 27:19, 32:23, 36:12, 36:17, 44:20, 47:15, 47:18, 47:19, 47:20, 49:19, 49:21, 50:4, 54:21, 58:11, 62:18, 64:19, 67:21, 72:1, 73:18, 73:22, 74:7.
ones 12:7, 41:18.
ongoing 69:4.
operation 70:14.
operations 51:22, 70:2, 70:5, 72:6.
opinion 53:12, 53:19.
opportunity 41:10, 41:13, 43:1, 43:4, 43:12.
order 13:3, 16:1, 16:5, 17:6, 40:19, 44:22, 46:2, 46:7, 46:11.
originally 8:11, 10:3.
others 23:9.
otherwise 80:15.
outcome 80:16.
overseas 62:12, 62:18, 68:7.
own 51:7.
<P>.
P. 2:19.
p.m 79:9.
package 58:11.
packages 17:5, 30:15, 53:1, 53:7, 54:9, 54:15, 55:18, 55:20, 58:6, 59:9.
packets 11:16, 11:20, 12:5, 12:6, 12:10, 13:2, 13:14, 13:17, 37:4, 46:2, 47:22, 56:5, 56:12, 56:18, 58:19.
PAGE 4:8.
paid 52:20.
part 12:23, 22:1, 44:21, 47:7.
participate 36:1.
participating 74:23.
particular 66:14.
parties 1:23, 80:12, 80:15.
party 67:16, 67:19, 67:23, 68:9, 68:15, 68:17, 68:22, 68:23.
88

passed 73:22.
PATRICIA 3:1.
pax 31:16, 32:6, 32:19, 41:12, 48:1, 74:15.
pay 36:15.
paying 45:6.
payments 52:16.
people 7:1, 15:4, 15:9, 15:11, 17:13, 20:14, 23:22, 24:17, 34:9, 35:23, 36:2, 36:22, 39:15, 55:23, 58:1.
performed 38:11.
period 8:14, 74:1, 74:2.
periods 8:8.
person 10:3, 28:7, 32:14, 32:16, 56:22, 58:20, 63:19, 75:1.
personal 53:19.
personally 41:21, 61:7, 62:14.
Peru 10:16, 10:17, 10:20, 18:13, 26:14, 26:17, 30:7, 36:22, 37:23, 38:5, 38:19, 39:3, 39:5, 39:8, 39:10, 40:18, 41:9, 41:11, 45:7, 48:9, 57:5, 57:14, 60:6, 61:4, 69:5, 73:3, 73:22, 73:23.
Peruvian 28:9, 28:12, 28:13, 44:14, 48:8, 48:21, 49:2, 49:6, 51:19, 52:21, 53:7, 74:10.
Peruvians 30:13, 30:21, 31:12, 33:10, 44:18, 45:20, 49:14, 50:6, 50:10, 50:23, 51:1, 51:2, 52:3, 52:5, 52:11, 52:16, 56:5, 56:7, 56:8, 57:1, 57:12, 60:2, 61:3, 66:1, 66:2, 66:11, 69:12, 70:3, 70:7, 71:23, 72:4, 72:10, 72:14, 72:22, 73:10.
Peter 31:10, 67:3, 75:7.
phone 38:15, 43:13, 59:2, 75:1, 77:2.
pick 11:2, 12:10, 20:21, 37:4, 47:22, 50:15, 57:21.
picked 11:16, 11:21, 13:18, 14:12, 50:11, 71:4.
pickup 51:1.
pipeline 39:16.
place 31:9, 35:22.
PLAINTIFF 1:5, 2:6, 41:7.
plane 31:23, 32:2, 32:4, 32:12, 33:1, 33:16, 34:3, 36:23, 49:4, 50:6, 50:8, 68:12, 69:13.
planes 30:13, 30:21.
played 62:19.
please 27:20, 40:23, 42:9, 42:14, 51:10, 72:19.
plenty 15:9, 15:11, 42:19.
point 30:10, 38:14, 39:22, 40:4, 43:17, 55:4, 71:5, 75:19.
point. 37:15.
position 49:7.
positions 8:17, 41:16.
possibly 16:22.
post 71:11.
potential 67:23, 76:22.
preparing 13:6.
presence 46:3.
present 1:22, 72:4.
presently 6:17.
pretty 32:5, 40:16.
previous 23:20.
Prior 8:4, 43:2, 43:3, 43:23, 48:16, 48:19, 49:5, 65:19, 68:12.
probably 15:16, 34:2, 42:23, 57:21, 67:1, 74:19.
problem 7:7, 37:12, 38:1, 76:3.
process 17:12, 29:2, 57:22, 58:4, 71:8.
processing 29:4, 44:13, 44:18.
procured 61:11, 78:13.
procuring 58:2.
produce 65:2, 65:5.
producing 65:4.
Project 8:18, 8:19, 8:21, 71:20.
projects 7:9.
proprietary 63:2, 63:14, 63:19, 63:23, 64:20.
prospective 38:13, 39:5, 39:9.
provide 46:2.
provided 46:16, 47:10, 52:6, 52:11, 52:20, 53:8, 57:2, 62:4, 65:17, 66:10, 67:2, 67:5, 67:10, 67:23, 73:10, 77:20.
provider 7:6, 61:14.
providing 71:12.
provisions 45:9.
Public 1:21, 80:1, 80:18.
pure 70:22.
pursuant 1:19.
put 7:22, 15:21, 15:22, 21:22, 22:18, 29:5, 46:2, 46:7, 46:11.
Putting 15:7, 15:23, 17:1, 17:5, 17:6, 21:19, 24:12, 27:12, 29:8, 30:13, 30:15, 32:23, 42:4, 44:21.
<Q>.
question 5:17, 25:14, 26:4, 38:10, 42:12, 45:13, 45:22, 48:18, 49:1, 49:9, 51:9, 51:11, 53:17, 60:8, 61:16, 61:18, 63:13, 64:7, 68:3, 68:5, 69:10, 69:18.
questionnaires 17:16.
questions 5:15, 5:16, 41:4, 41:6, 42:8, 65:14, 73:13.
quick 10:23.
quickly 32:5, 40:18, 57:23, 76:20, 76:22, 77:3, 77:5.
Quite 15:3, 29:20,

31:8, 33:14, 36:12, 40:17, 41:19, 58:4, 58:17.
<R>.
raise 48:20, 65:20.
ran 22:4.
Rather 42:11, 57:23.
reached 50:10, 51:19.
read 78:22, 79:5, 79:7.
reading 79:11.
ready 25:11, 63:17.
real 7:9, 10:23, 40:18.
realized 37:21, 38:1, 39:22.
really 6:23, 10:7, 27:2, 36:4, 36:16.
reason 45:23.
recall 12:18, 28:6, 28:8, 29:17, 35:5, 35:13, 37:19, 50:2, 50:4, 56:21, 61:7, 62:18, 66:13, 72:12, 75:15, 75:16, 76:1, 78:17.
received 56:17.
recess 41:2.
recollection 6:3, 31:12.
record 41:3, 64:17, 80:9.
records 26:21.
reduced 80:7.
Reed 6:13.
referred 53:2.
referring 44:13.
Regarding 45:19, 48:8, 55:7, 55:8, 55:17, 61:3, 66:11, 67:13, 68:6, 68:7, 68:23.
regular 71:10.
related 80:11.
relates 61:15.
relationships 60:23.
relative 80:13.
rely 71:13.
remember 10:21, 10:22, 11:20, 21:6, 26:10, 27:5, 27:9, 28:3, 32:1, 34:19, 34:21, 35:10, 37:16, 37:18, 38:4, 47:5, 52:10, 74:13, 74:23.
remembering 6:7.
remembers 76:14.
remind 43:14.
repeat 49:8, 68:4, 72:19.
rephrase 5:18.
Reported 2:2.
reporter 4:21, 5:22, 78:23.
reports 62:20, 66:7, 66:9, 66:10, 66:14, 67:3, 67:5.
request 48:17, 49:5.
required 58:22.
requirement 35:8, 35:10, 35:14, 39:23, 72:11, 72:15, 72:22, 73:11.
requirements 35:6, 69:3.
respect 35:7, 38:13, 79:1.
respective 1:23.
response 52:18.
responsibilities 10:10.
restricted 23:7.
return 26:14, 57:13.
returned 26:6, 61:3.
returning 60:2.
review 15:20.
Rice 31:10, 67:3, 67:9, 75:7.
ridiculous 65:17.
Road 3:3.
Rob 31:10, 40:4, 47:19, 56:21, 73:1, 75:12, 75:21, 75:23, 76:18, 76:23, 77:5.
Robert 71:21, 72:5, 72:9.
Rodriguez 21:22.
role 62:19.
Ron 2:2.
Ronald 1:20, 80:2, 80:18.
room 14:17, 15:13, 15:14, 15:15, 15:16, 17:13, 19:19, 19:20, 20:14, 28:18, 28:22, 43:3, 44:21, 45:4.
rooms 20:22.
Rosenbaum 12:13, 12:17.
Rubin 31:10, 40:4, 47:20, 56:21, 73:2, 75:12, 75:21, 75:23, 76:19, 77:5, 77:15, 78:8.
rules 54:20, 55:2.
run 57:22.
<S>.
S. 2:17.
Sarah 75:7.
saw 17:13, 78:5.
saying 55:11, 59:9.
says 70:13.
Schwartz 75:12.
screen 41:20, 41:23, 42:1, 42:16, 42:20, 76:7, 77:4.
screened 41:22.
screening 12:22, 13:6, 35:23, 36:2, 36:5, 44:6, 44:9, 44:11, 44:18, 44:23, 45:1, 58:2.
second 12:6, 18:19, 19:3, 19:6, 21:16, 28:7, 29:22, 36:11, 36:21, 37:1, 38:6, 44:3, 45:22, 46:1.
secret 64:21.
secure 20:1.
security 10:2, 13:7, 54:10, 55:14, 60:3, 61:10, 61:14, 62:4, 62:8, 62:12, 68:6, 69:1.
seeing 35:5.
seemed 76:20.
seen 73:8.
semi-collated 22:2.
send 10:20, 24:19, 37:23.
sending 30:13.
sent 10:17, 35:17, 38:4, 41:11, 46:6, 49:18, 52:17, 57:8, 57:13, 59:21, 60:2, 77:16.
September 8:12, 8:14, 8:15, 9:7, 18:9.

service 7:6, 9:4.
set 34:1, 39:11.
seven 61:12, 61:22, 62:3, 62:6, 62:8, 67:13.
Seventh 2:10.
Sgt. 32:21.
shipment 49:12, 49:13, 49:17.
shipments 49:14.
shipped 34:7, 49:4, 57:3.
shipping 31:13.
Short 41:2.
shorthand 80:7.
show 23:10, 26:22.
showing 65:2.
side 22:18, 23:12, 45:3.
sides 20:14.
signal 49:5.
signature 79:5, 79:11.
significant 7:11.
simply 59:19.
six 23:21, 23:23, 24:1, 67:21.
Slick 10:3, 31:4, 66:13, 66:20, 66:21.
slips 41:12.
small 6:23, 62:19.
smaller 36:14.
social 5:11, 7:10, 43:10.
sold 56:11, 56:14.
SOLUTIONS 1:4, 7:8.
somebody 9:12, 31:6, 36:14, 40:1, 56:1.
Someone 23:5, 23:16, 30:15.
sometime 14:12, 29:14, 76:4.
Sometimes 5:19, 59:5, 59:7.
somewhat 46:3.
soon 14:5.
sorry 10:1, 12:15, 17:3, 18:10, 24:14, 28:5, 43:7, 48:2, 49:8, 67:1, 73:6.
sort 60:3.
sought 64:5.
sounded 10:6.
Sousa 32:21.
South 6:13.
space 19:22, 20:4, 20:9.
Spanish 17:16, 17:20, 40:13, 42:19, 42:23, 52:9.
speaker 74:21.
speaking 38:2, 40:2, 45:2, 54:19, 54:22.
specifically 10:5, 10:22, 35:11, 67:14, 75:15.
speculate 59:12, 61:19.
speculating 51:14, 70:11.
speculation 51:5, 51:13, 58:13, 70:22.
spell 27:20.
spend 35:21.
spending 10:14.
spent 10:16, 11:7, 12:12, 12:23, 26:11, 33:14, 33:23, 38:5, 47:20.
spoke 40:16, 43:1, 43:13, 43:15, 72:5.
stand 71:11.
standard 53:21, 54:1, 54:3.
standing 36:17.
start 8:13, 31:13.
started 7:19, 9:16, 30:12, 38:14, 39:22, 40:18, 71:5, 76:5, 76:23.
starting 7:23, 78:12.
State 11:18, 25:11, 34:23, 35:12, 42:9, 42:14, 53:9, 54:13, 57:19, 72:13, 72:21, 73:9, 77:7, 77:11, 77:15, 77:20, 78:4.
stated 42:13.
States 1:1, 16:19, 18:3, 26:9, 29:11, 64:22.
status 62:20, 66:7, 66:9, 66:14, 67:2.
stay 19:5.
stayed 19:7, 19:11, 19:13, 27:6, 32:9.
staying 27:4.
sticks 31:15.
Stop 77:6.
Street 2:18, 59:4.
strike 48:17, 49:1, 61:16.
studied 40:15.
stuff 7:2, 13:9, 30:12, 41:13, 46:7, 74:22, 76:8.
subcontractor 68:21.
subject 43:18, 43:21.
substantial 21:2, 74:1, 74:2.
sufficient 39:19, 46:14, 46:19, 46:21.
sufficiently 39:16.
suicide 74:10.
suitcase 13:16, 29:20.
Suite 2:18.
supervision 80:8.
supposed 25:21, 25:22, 40:12.
sworn 5:5, 80:5.
Systems 6:20, 6:22.
<T>.
T. 2:8.
table 14:22, 15:2, 20:17, 20:19.
talked 39:13.
tasks 9:13.
taxi 23:18.
Taylor 8:16.
Telephone 2:12, 2:21, 3:5.
ten 23:5, 23:6, 44:20.
terms 61:19.
test 38:15, 39:1, 40:6, 77:2, 78:13.
testified 5:5, 70:1, 76:13, 77:10.
testify 42:3, 42:7, 54:2, 58:16, 59:13, 63:5, 70:20.
testimony 77:21, 79:2, 80:4, 80:6, 80:10.
testing 35:15, 35:20.
tests 38:11, 39:4.

Thacker 71:21, 72:5, 72:9.
Thanksgiving 31:20, 34:10.
Thereupon 5:2, 79:9.
third 12:6, 26:16, 27:3, 27:7, 27:15, 29:13, 47:1, 47:13, 47:16, 47:18, 61:14, 67:19, 67:22, 68:17, 68:23.
though 46:3.
thousand 54:23.
three 11:1, 14:10, 18:23, 27:6, 29:7, 49:14, 55:15, 74:4.
three-day 11:5.
Thursday 49:23.
Tim 71:20, 72:4, 72:9.
timely 58:4.
today 43:2.
together 15:8, 17:2, 17:5, 21:19, 22:9, 24:12, 27:12, 29:8, 30:16.
took 13:10, 14:11, 23:19, 31:7, 33:13.
total 11:8, 77:9.
totally 65:16.
toward 76:11.
towards 29:14.
town 29:5.
training 71:6, 71:8.
transcribing 79:1.
transcript 79:5.
transcription 80:8.
transfer 56:17.
transferred 56:12.
translated 17:20.
transportation 50:23.
travel 7:11, 7:14.
traveled 33:22.
traveling 11:9, 31:8.
trip 11:1, 11:5, 26:17, 27:7, 29:14, 29:22, 44:4, 44:5, 44:7, 45:20, 45:22, 46:1, 47:1, 47:7, 47:13, 47:16, 47:18, 47:21.
Triple 56:12, 56:14, 57:3, 57:8, 57:11, 59:20, 59:23, 60:5, 60:10, 60:13, 60:23, 61:4, 61:5.
trips 18:23, 36:16, 47:16, 72:1.
true 46:10, 48:23, 80:9.
try 5:18, 40:8, 42:10.
trying 43:15.
Tuesday 49:22.
turned 10:15.
Turner 1:16, 4:4, 5:3, 5:9, 6:12, 25:7, 34:22, 37:11, 41:9, 42:8, 54:8, 55:8, 55:9, 55:13, 60:8, 65:12, 65:13, 66:20, 67:9, 73:17, 75:11, 77:14.
Two 8:8, 8:10, 9:5, 9:9, 14:17, 18:5, 18:16, 18:23, 19:15, 20:3, 20:9, 20:13, 20:16, 27:13, 27:16, 35:8, 47:4, 49:18, 49:20, 49:21, 50:1, 72:1.
two- 11:5.
two-and-a-half 11:9, 55:15.
two. 16:22.
type 20:11, 60:14, 67:2.
typing 24:17.
<U>.
ultimately 53:8, 57:2.
uncle 59:3.
understand 5:17, 6:11, 10:9, 11:15, 19:10, 19:18, 37:13, 68:3, 70:21.
understanding 38:2, 48:6, 50:9, 51:18, 58:9, 58:10, 61:9, 61:13, 67:15, 68:8, 68:11, 68:14, 69:6, 69:23, 70:2.
understood 5:16, 23:19, 40:16, 44:22, 73:1.
unique 7:9.
Unit 6:13.
United 1:1, 16:19, 18:3, 26:9, 64:22.
until 48:10, 65:5.
<V>.
vague 40:1.
valuable 59:19.
value 59:9, 59:16, 59:17.
verbalized 5:20.
Vienna 1:12.
Virginia 1:12, 1:22, 2:20, 3:4, 6:14, 80:19.
visit 36:12, 38:7.
visualizing 36:18.
<W>.
wait 23:9, 51:10, 51:13.
waiting 14:6, 57:9, 57:12, 61:4.
waive 79:4.
waived 79:11.
walked 33:18, 43:8.
Walter 6:13.
wanted 9:14, 16:13, 16:17, 31:5.
wanting 42:23.
wants 42:11.
Washington 2:11.
Wednesday 49:22, 75:2.
week 16:21, 18:4, 18:19, 19:7, 20:23, 22:8, 25:9, 25:18, 26:6, 27:1, 32:19, 38:6, 74:19.
weeks 11:1, 18:5, 18:17, 36:13.
whatever 10:13, 14:21, 21:23, 28:22, 33:3, 36:8, 57:22, 67:8.
whatsoever 66:10.
whenever 38:7.
wherever 24:5, 24:15, 51:2.
whether 44:17, 52:8, 52:19, 54:8, 55:18, 55:19, 56:11, 57:1, 57:3, 59:13, 69:6.
whole 7:1.
whom 12:10,

80:3.
will 5:18, 53:1, 53:20, 54:21, 61:17, 63:8, 65:14, 65:20, 67:14, 68:5, 77:22.
Winter 3:3.
withdraw 38:10.
Without 65:23.
WITNESS 4:4, 5:4, 8:19, 25:21, 26:5, 34:5, 42:15, 46:18, 55:10, 57:17, 59:15, 62:16, 67:1, 69:19, 71:1, 71:19, 78:3, 78:11, 79:7, 79:11, 80:4, 80:6, 80:10.
witnessed 49:3.
word 16:13.
words 15:7, 16:4, 23:4, 28:21, 29:3, 42:5, 68:10.
work 7:4, 8:4, 9:7, 10:5, 19:15, 19:22, 20:3, 20:8, 20:20, 22:14, 23:7, 27:8, 28:17, 29:8, 42:23, 45:18, 47:9, 58:1, 60:10, 60:14, 61:15, 63:18, 66:1.
worked 7:17, 7:20, 8:16, 9:3, 9:11, 17:13, 22:1, 22:9, 27:11, 27:13, 27:15, 28:19, 28:20, 29:2, 32:15, 47:7, 61:10, 62:17, 68:21.
working 7:22, 10:7, 12:11, 15:9, 17:14, 20:17, 20:19, 25:7, 46:4, 62:18.
worried 6:9.
writing 62:20, 72:23.
written 52:9.

<Y>.
Yargici 75:8.
year 7:20.
years 55:16.
yesterday 43:13.
York 2:9.

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ORIGINAL

- - - - - - - - - - - - - - - - - - - x
3D GLOBAL SOLUTIONS, INC., :
: 
Plaintiff, :
vs. : CA No.
: 1:06-CV-722 (GK)
MVM, INC., :
:
Defendant. :
- - - - - - - - - - - - - - - - - - - x

Vienna, Virginia

Wednesday, May 2, 2007

Deposition of MICHAEL F. DODD, a witness, called for examination by counsel for defendant, pursuant to notice, at the offices of MVM, Inc., 1593 Spring Hill Road, Suite 700, Vienna, Virginia 22182, before Sandria L. Cox, a notary public in and for the Commonwealth of Virginia, beginning at 1:30 p.m., when were present on behalf of the respective parties:

McCOY COURT REPORTING ASSOCIATES
8120 Little River Turnpike
ANNANDALE (Fairfax County), VIRGINIA 22003
TELEPHONE: (703) 280-4422

EXHIBIT 7

completing the administrative packages.

Q. And that took 3500 manhours?

A. Thirty-five hundred manhours.

Q. And was your contract with Wackenhut on a per-person basis or per hour?

A. Project. We contracted them for the project.

Q. And how much was your contract for?

A. Probably close to a quarter-million dollars.

Q. How much did you pay them?

A. A quarter-million dollars.

Q. Did you have a guarantee with them?

A. How do you mean?

Q. I mean --

A. Oh, yeah, the same that I provide: a 100% replacement guarantee. So if the client was unhappy with a single candidate, or all of them, they could send them back to be replaced at no cost.

Q. Did you notify Wackenhut that these TCNs were not acceptable?

federal contracts.

So all of that information that's captured there is reviewed by Department of State. It's not like they would do something else.

The background check that we do is provided by the federal government to us that we then screen candidates with. Those are not different.

Q. When were you advised there was a problem with the language proficiency of the TCNs?

A. December 5th, 7th. Around in there.

Q. And what did you do?

A. I said, Fine. Identify who needs to be replaced. Let me know their names so I can work their movement back and how many people I need to replace.

I had that conversation with peter Rice, Rob Rubin and Tim Lynch, the project manager.

Q. And did you understand from --. What did you understand from each one of them? What did you understand from Peter Rice?

A. That there were going to be some men

security company in the world --

BY MR. ROSENBLUM:

Q. I understand that.

A. -- they're very proficient at doing that.

Q. I'm not suggesting you don't have a right to rely on someone you contract with.

A. Right.

Q. I mean, anybody you contract with --

A. It sounds like you're suggesting that they didn't do what they were supposed to do.

Q. Wackenhut certified to you that these people met the criteria of the contract.

A. Absolutely.

Q. They used the word "certify"?

A. I don't know.

Q. Does your contract use the word "certify"?

A. I don't know.

Q. Notwithstanding what Wackenhut said to you or promised you, you certified to MVM that these applicants, future employees of MVM, met the

 requirements of their contract with the government.

A Yes. And if they were unhappy with anyone, I would replace them at no cost.

Q. You've been paid a deposit on this contract, weren't you? Like 17,000 or 18,000.

A. I don't know off the top of my head. Probably. It was probably that.

Q. Now, have you had any conversations with Jason Turner after he left Peru?

A. Yes. Maybe a handful.

Q. When were those and give me the content of those discussions, please.

A. I don't know the dates honestly. It's been so infrequently. The content, the very first one, was that he had resigned and went to another company. I don't know the name.

And the other two times were casual.

Q. Anything about MVM or this contract?

A. No.

Q. Did he tell you why he resigned?

A. I'm sure he mentioned it. I don't know if I would want to speculate why he left.

MVM SECURITY & STAFFING SERVICES

December 14, 2005

Mike Dodd
3D Global Solutions, Inc.
12898 Pontell Place
Westfield, Indiana 46074

Re: Agreement for Recruiting Services by and between 3D Global Solutions, Inc. and MVM, Inc. dated September 26, 2005 (the "Agreement")

Dear Mr. Dodd:

As you know, by letter dated December 2, 2005, the State Department's Contracting Officer for MVM's contract to provide security services to the US Embassy in Kabul (the "Contract") advised MVM that many of the guards recruited and sent to Kabul are not fully qualified to work on the Contract. Over 80% of the guards supplied by your firm lack the ability to speak English at the level required by the Contract. In addition, as a result of their lack of English proficiency, most of these guards have failed basic guard force skills tests and weapons proficiency tests.

To date, 3D has not met its obligations under the Agreement to provide a guard force that meets the required qualifications and is in default under the Agreement. MVM therefore requires that 3D strictly adhere to the terms of the Agreement and meet its commitments thereunder.

We also remind you that Paragraph H the Agreement requires that 3D treat as confidential all information it receives concerning MVM's business, including but not limited to, MVM's contracts, personnel and operations. This section prohibits 3D from talking to the press, the Peruvian Embassy or anyone else about any of these matters.

Nothing contained herein shall be deemed to be a waiver any rights and remedies MVM has or may have under the Agreement or under any applicable law including the right to seek and recover damages for breach of the Agreement.

Very truly yours,

Robert Rubin
Senior Vice President

MVM, Inc.
*Service Support Success*
1593 Spring Hill Road · Suite 700 · Vienna, VA 22182
Telephone: (703) 790-3138 · Fax: (703) 827-0780 · VA Lic. #11-1259

EXHIBIT 8